Raymond G. BURGE and Kathleen E. Burge, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 7557.

United States Court of Appeals Fourth Circuit.

Argued Jan. 17, 1958.

Decided March 3, 1958.

Leon L. Rice, Jr., Winston-Salem, N. C. (C. W. Womble, and Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., on the brief), for petitioners.

Thomas N. Chambers, Atty., Dept. of Justice, Arlington, Va. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attys., Dept. of Justice, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, SOBELOFF, Circuit Judge, and WARLICK, District Judge.

PARKER, Chief Judge.

■ This is a petition to review a decision of the Tax Court which upheld determinations by the Commissioner of Internal Revenue of deficiencies in income taxes for the years 1950 and 1951. The Commissioner had assessed the deficiencies upon a finding that gains from the redemption and sale of stock reported by taxpayer as capital gains were taxable as ordinary income, basing his action upon the ground that the corporation was a "collapsible corporation" within the meaning of section 117(m) of the Internal Revenue Code of 1939. 26 U.S. C.A. § 117(m). The Tax Court in an opinion reviewed by the full court sustained, without dissent, the determination of the Commissioner. Little need be added to that opinion, which comprehensively states the facts of the case and fully discusses the questions of law applicable. See 28 T.C. 246.

The facts necessary to an understanding of the questions presented may be stated briefly as follows: Taxpayer with two other persons organized a corporation under the name of Park Terrace, Inc., for the purpose of constructing an apartment house with the proceeds of a loan guaranteed by the Federal Housing Administration. Taxpayer and one of these associates, one Lester, had been engaged for a number of years in constructing houses for sale and selling them, and taxpayer and this associate owned the corporation, Park Builders, Inc., which did the building of the apartment house. He and his two associates invested $100 each in the Class A common stock of Park Terrace, which was the only investment that they ever made in that corporation. 41,097 shares of Class B common stock were issued to each of them; but they paid nothing for it ex-

cept that an entry was made on the books charging them for it at the price of $1 per share. 70,151 shares of Class B common stock were issued to the architect of the apartment house, who was paid $9,000 in cash in full for his services and gave no consideration for the stock, which he later transferred to taxpayer and Lester for the sum of $500.

Work on the apartment house was begun in October 1949 and substantially completed in October 1950. Some of the apartments became available for occupancy in May 1950, and the final group was completed during the week which ended November 17, 1950. The construction loan on the project was $1,632,000, the last advance on which was made October 23, 1950. On October 31, 1950, a resolution was adopted by Park Terrace directing that entries be made on its books to show the value of the property at current replacement costs to be $1,819,908, of which only $60,000 represented the value of the land, although the cost of the project was $176,000 less than the amount of the loan. On November 4, 1950, the Class B stock, all of which was held at that time by taxpayer and Lester, was purchased from them by the corporation at the price of $221,000 and retired. The price was paid by crediting the amounts charged on the books as the purchase price of the stock and paying to taxpayer and Lester the remainder in cash. Taxpayer received cash as the result of this transaction in the sum of $45,685 and he concedes that $45,435 of this amount is gain, which he treated as long term capital gain for the year 1950.

Within a month after the redemption of the Class B stock, i. e. on December 4, 1950, taxpayer and his associate Lester, who between themselves owned at that time all of the Class A stock, entered into a contract with one Bolich under which Bolich was to act as their agent in an effort to sell this stock, which carried the ownership and control of the corporation, subject to its indebtedness to an agency of the federal government. This effort did not succeed, but in January 1951 Bolich put taxpayer in touch with one McLean, who wished to purchase the property for use in connection with a trucking business in which he was interested. McLean acquired control of the property by purchasing the Class A stock of the corporation. Taxpayer sold his Class A stock for $41,388.84, of which he admits that $41,322.89 was gain. He reported this amount as long term capital gain in his return for the year 1951.

On these facts, we see no reason to disturb the decision of the Tax Court which sustained the finding of the Commissioner that the gain reported by taxpayer was derived from sale or exchange of stock in a "collapsible" corporation and was taxable as ordinary income under section 117(m) of the Internal Revenue Code of 1939. The word "collapsible" considered apart from its context would be somewhat misleading; but there can be no question, we think, as to what Congress meant by a "collapsible corporation" as used in the statute. That term was used to describe a corporation which is made use of to give the appearance of a long term investment to what is in reality a mere venture or project in manufacture, production or construction of property, with the view of making the gains from the venture or project taxable, not as ordinary income, as they should be taxed, but as long term capital gains. Because the basic type of transaction which gave rise to the legislation involved the use of temporary corporations which were dissolved and their proceeds distributed after tax avoidance had been accomplished, the term "collapsible corporation" was employed to describe the corporations used for this form of tax avoidance; but the statute was drawn in broad general terms to reach the abuse which had arisen, whatever form it might take.

The committee reports describe a collapsible corporation as "a device whereby one or more individuals attempt to convert the profits from their participation in a project from income taxable at ordinary rates to long term capital gain taxable only at a rate of 25 per cent". H.R.Rep.No.2319, 81st Cong.2d Sess. 96; Sen.Rep.No.2375, 81st Cong.2d Sess. 88.

See also article by Charles C. McLean, Jr., 67 Harvard Law Review 55. By subsection 3 of section 117(m) the application of the section is limited to cases where the stockholder owns more than 10 per cent of the stock of the corporation, where more than 70 per cent of the gain in a taxable year is attributable to the project and where the gain is realized within three years of the completion of the project. Subject to these limitations upon its application, the statute defines a collapsible corporation as "a corporation formed or availed of principally for the manufacture, construction or production of property * * * with a view to * * * the sale or exchange of stock * * * prior to the realization by the corporation * * * of a substantial part of the net income to be derived from such property."[1]

We think that the case here presented falls clearly within the statute. There can be no question but that the taxpayer realized gain from the sale or exchange of stock in the corporation, or that the corporation was availed of principally[2] for the construction of property, the apartment house, or that the gain was attributable to such property. It seems equally clear that the corporation was availed of with a view to the sale of stock or a distribution to stockholders prior to the realization by the corporation of a substantial part of the net income to be derived from the property. Taxpayer's testimony that he embarked upon the enterprise with a view of making a permanent investment in an apartment house, is very largely discredited by the fact that his initial investment was only $100, that the corporate charter was so drawn as to allow the early retirement of the Class B stock which was retired as soon as the building was completed, with taxpayer and his associate drawing out the surplus money derived from the loan instead of leaving it in the treasury of

1. The pertinent portions of the statute are as follows:

"(m) Collapsible corporation. (1) Treatment of gain to shareholders.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

"(2) Definitions. (a) For the purposes of this subsection, the term 'collapsible corporation' means a corporation formed or availed of principally for the manufacture, construction, or production of property, * * * or for the holding of stock in a corporation so formed or availed of, with a view to—(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing, the property of a substantial part of the net income to be derived from such property, and (ii) the realization by such shareholders of gain attributable to such property.

* * * * *

"(3) Limitations on application of subsection. In the case of gain realized by a shareholder upon his stock in a collapsible corporation—(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, * * * such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation; (B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced, * * *; and (C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production."

2. The argument that the word principally in the statute should be construed to modify the "view" that the statute requires instead of "for the manufacture, construction, or production of property" is without support of any rule of law or of grammar with which we are familiar. For a discussion of this question, see article by McLean, supra, 67 Harvard Law Review 58-60.

the corporation to meet the exigency arising from failure to rent apartments, that arrangements were entered into almost immediately to sell the Class A stock and that the Class A stock was sold within less than three months after the completion of the building. At all events, the testimony offered by the taxpayer as to his intent is not sufficient, in the light of these circumstances, to overcome the presumption of correctness attaching to the findings of the Commissioner.

The Tax Court thought that the "view" required by the statute was clearly established by the circumstances relating to the issuance and redemption of the Class B stock. We agree with this; but we think, also, that the circumstances surrounding the sale of the Class A stock should be considered in connection therewith and that, when so considered, there can be no question but that the "view" required by the statute has been adequately established. It is not necessary that the "view" exist at the time the corporation is formed. It is sufficient that it exist when the corporation is "availed of"; and the corporation was availed of here to dispose of all interest that the shareholders had in the project by sale or exchange of stock before it had realized any substantial part of the net income to be derived from the property. It is provided by Treasury Regulations 111 sec. 29.117–11(d) (2) that a corporation will ordinarily be considered a collapsible corporation where the activity of production or purchase of property is substantial and is followed by the actual occurrence of the events required to be contemplated by paragraphs (2) (A) (i) and (ii) of the statute. These events are the sale or exchange of stock or the receipt of a liquidating distribution before the corporation realizes "a substantial part of the net income to be derived from such property", and the realization by the shareholders of "gain attributable to such property".

 Taxpayer argues that the statute relied on is not applicable because there was no liquidation of Park Terrace and

because it is said that the statute was intended to apply only in cases where such liquidation occurs. The answer is that the language of the statute is not so limited. While cases where liquidation occurs were prominent in the discussion of the evils which the statute was intended to prevent, it is clear from the committee reports that it was not intended that the legislation be limited to such cases and the act as passed is not so limited. The rule applies that "if Congress has made a choice of language which fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators". Barr v. United States, 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765; Browder v. United States, 312 U.S. 335, 339, 61 S.Ct. 599, 85 L.Ed. 862; People of Puerto Rico v. Shell Co., 302 U.S. 253, 257, 58 S.Ct. 167, 82 L.Ed. 235.

Kindred arguments are made to the effect that the distribution to Class B stock was not from the sale of stock but from the excess of the construction loan and was not attributable to the construction of the property; but this is a mere grasping at straws. The statute covers distribution to shareholders as well as sales or exchanges of stock; and if the liquidation of the Class B stock did not result from a sale to and purchase of the stock by the corporation, which was the form in which the transaction was cast, it was certainly "a distribution to its shareholders". It is objected that the distribution was made in cash and not in "property"; but nothing in the statute requires that the distribution be in property and, as this case well illustrates, the evil at which the legislation was directed could inhere in a cash distribution as well as in a distribution of property. The effect of the cash distribution, of course, was to decrease the value of the Class A stock, which was sold shortly thereafter.

 Equally specious is the contention that because the distribution was made from the excess of the construction loan it was not attributable to the property

being constructed. The answer, of course, is that without the construction of the property there would have been no construction loan and no excess therein to be distributed to shareholders of the corporation. Treasury Regulations 111, sec. 29.117–11(e), Example 1,[3] is directly in point and clearly sustains the action of the Commissioner here. That regulation is important as an administrative construction of the statute and may not be lightly disregarded. Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831. As said by the Supreme Court in the case cited:

> "This Court has many times declared that Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with administration of these statutes which should not be overruled except for weighty reasons. See, e. g., Fawcus Machine Co. v. United States, 282 U.S. 375, 378, 51 S.Ct. 144, 145, 75 L.Ed. 397."

■ Taxpayer calls attention to an unpublished ruling of the Deputy Commissioner in the case of another taxpayer made prior to the promulgation of this regulation; but the effect of section 117 (m) was not considered in this ruling and it is well settled that it is not to be accorded the weight of a regulation. As said by the Supreme Court in Helvering v. New York Trust Co., 292 U.S. 455, 468, 54 S.Ct. 806, 810, 78 L.Ed. 1361, such rulings "have none of the force or effect of Treasury Decisions and do not commit the Department to any interpretation of the law." See also our recent decision in Sims v. United States, 4 Cir., 252 F.2d 434.

The Tax Court held that the facts and circumstances with respect to the retirement of the Class B stock were sufficient to justify the Commissioner's determination that Park Terrace was a "collapsible" corporation within the meaning of the statute and that nothing occurred prior to the sale of the Class A stock, less than three months later, to warrant a holding that there had been a change of "view" in the meantime. As stated above, we are in accord with this; but we think it clear also that the liquidation of the Class B stock should be considered along with the sale of the Class A stock and that, when so considered, there is no reason for holding that the corporation was not "availed of" with the "view" required by the statute with respect to both transactions.

Affirmed.

---

3. Example 1 is as follows: "Example (1). On January 2, 1951, A formed the W corporation and contributed $50,000 cash in exchange for all of the stock thereof. The W Corporation borrowed $900,000 from a bank, the loan being insured by the Federal Housing Authority, and used $800,000 of such sum in the construction of an apartment house on land which it purchased for $50,000. The apartment house was completed on December 31, 1951. On December 31, 1951, the corporation, having determined that the fair market value of the apartment house, separate and apart from the land, was $900,000, made a distribution (permitted under the applicable state law) to A of $100,000. At this time, the fair market value of the land was $50,000. As of December 31, 1951, the corporation has not realized any earnings and profits. In 1952, the corporation began the operation of the apartment house and received rentals therefrom. The corporation has since continued to own and operate the building. The corporation reported on the basis of the calendar year and cash receipts and disbursements.

"Since A received a distribution and realized a gain attributable to the building constructed by the corporation, since, at the time of such distribution, the corporation has not realized a substantial part of the net income to be derived from such building, and since the construction of the building was a substantial activity of the corporation, the W Corporation is considered a collapsible corporation under (m) (2) of this section. The provisions of section 117(m) (3) do not prohibit the application of section 117 (m) (1) to A. Therefore, the distribution, if and to the extent that it may be considered long-term capital gain rather than ordinary income without regard to section 117(m), will be considered ordinary income under section 117(m) (1)."