Rose Sidney, et al.,[1] Petitioners, v. Commissioner of Internal Revenue, Respondent.

Docket Nos. 56368–56371, 60235, 60236, 60520, 60521. Filed August 25, 1958.

*Irving Warshaw, C. P. A., Marcus Franks, Esq.,[2] Jacob Mishler, Esq.,[3]* and *Herman S. Greitzer, Esq.,[4]* for the petitioners.

*John F. Walsh, Esq.,* and *Herbert Rothenberg, Esq.,* for the respondent.

The respondent determined deficiencies in income taxes in these consolidated cases as follows:

| Docket No. | Petitioners | Deficiency | |
|---|---|---|---|
| | | 1950 | 1951 |
| 56368 | Rose Sidney | $9,429.10 | $878.90 |
| 56369 | Morris Brecher | 12,363.11 | 1,316.21 |
| 56370 | Molly Brecher | 9,388.78 | 812.00 |
| 56371 | Susan Brecher | 18,901.59 | |
| 60235 | Arthur Wohl and Bernice Wohl | 21,859.20 | 1,216.28 |
| 60236 | Alfred Wohl and Sheila Wohl | 19,118.06 | 1,601.84 |
| 60520 | Kenneth Itchkow | 8,882.50 | 793.94 |
| 60521 | Charles K. Itchkow and Sadie Itchkow | 47,607.16 | 4,135.89 |

The issues for decision are whether any of the gain realized by petitioners upon the distribution of cash received by them in 1950 and 1951

[1] Proceedings of the following petitioners are consolidated herewith: Morris Brecher, Docket No. 56369; Molly Brecher, Docket No. 56370; Susan Brecher, Docket No. 56371; Arthur Wohl and Bernice Wohl, Docket No. 60235; Alfred Wohl and Sheila Wohl, Docket No. 60236; Kenneth Itchkow, Docket No. 60520; and Charles K. Itchkow and Sadie Itchkow, Docket No. 60521.

[2] Counsel for Rose Sidney, Docket No. 56368, Morris Brecher, Docket No. 56369, Molly Brecher, Docket No. 56370, and Susan Brecher, Docket No. 56371.

[3] Counsel for Arthur Wohl and Bernice Wohl, Docket No. 60235, and Alfred Wohl and Sheila Wohl, Docket No. 60236.

[4] Counsel for Kenneth Itchkow, Docket No. 60520, and Charles K. Itchkow and Sadie Itchkow, Docket No. 60521.

from two corporations is gain from the sale or exchange of property which is not a capital asset as provided in section 117 (m) (1) of the Internal Revenue Code of 1939, and whether respondent has the burden of proof in Docket Nos. 60520 and 60521 by allegedly raising new matter in amended answers filed therein. Due to mathematical errors in the deficiency notices of Kenneth Itchkow, Docket No. 60520, and Charles K. Itchkow and Sadie Itchkow, Docket No. 60521, a Rule 50 computation will be necessary.

### FINDINGS OF FACT.

Some of the facts have been stipulated. We incorporate herein by this reference the stipulation of facts and the exhibits attached thereto and identified therein.

Petitioners Arthur and Bernice Wohl, Alfred and Sheila Wohl, and Charles K. and Sadie Itchkow, respective husbands and wives, filed joint income tax returns for the calendar years 1950 and 1951. Rose Sidney, Morris Brecher, Molly Brecher, Susan Brecher, and Kenneth Itchkow each filed separate returns for the calendar years 1950 and 1951. All returns were filed with the collector of internal revenue for the first district of New York.

On January 28, 1949, the Federal Housing Administration (hereinafter referred to as F. H. A.) issued commitments for mortgage insurance in connection with the proposed construction of two projects composed of five 3-story garden apartment buildings, accommodating 210 families (Kew Terrace, Inc.), and four 3-story garden apartment buildings, accommodating 150 families (Kew Terrace #2 Corp.), to be erected upon 2 tracts of land held by Kew Knolls, Inc. The F. H. A. insurance commitment was issued pursuant to section 608 of the National Housing Act under F. H. A. project numbers 012-42048 and 012-42083, in the respective amounts of $1,769,000 and $1,236,800. Morris Brecher, Alfred Wohl, and Charles K. Itchkow were designated as sponsors of the two projects.

Petitioners Alfred Wohl and Charles K. Itchkow each had considerable experience in the construction industry. Petitioner Morris Brecher has had considerable experience as an investor in the real estate field.

Alfred Wohl was the motivating force behind the two F. H. A. projects in question. The books and records of the respective corporations were kept at his office, he was in daily contact with the progress of the projects, and had knowledge of the finances pertaining thereto.

On February 16, 1949, and April 11, 1949, respectively, Kew Terrace, Inc. (hereinafter referred to as Kew Terrace), and Kew Terrace #2 Corp. (hereinafter referred to as #2 Corp.) were organized under the laws of the State of New York, each with an authorized capital

stock consisting of 100 shares, par value $1 each, preferred stock, and 100 shares of common stock, no par value.

On March 23, 1949, and April 19, 1949, Kew Terrace and #2 Corp., respectively, issued 15 shares of the common stock for the sum of $200 per share, or a total sum of $3,000 per corporation, to the following-named persons:

| | Shares | Per cent ownership by family |
|---|---|---|
| Rose Sidney | 1¼ | |
| Morris Brecher | 1¼ | |
| Molly Brecher | 1¼ | 33⅓ |
| Susan Brecher | 1¼ | |
| Arthur Wohl | 2½ | |
| Alfred Wohl | 2½ | 33⅓ |
| Charles K. Itchkow | 2 | |
| Sadie Itchkow | 2 | 33⅓ |
| Kenneth Itchkow | 1 | |

Rose, Morris, Molly, and Susan are sisters and brother; Arthur and Alfred are brothers; and Charles, Sadie, and Kenneth are, respectively, husband, wife, and son. The 100 shares of preferred stock of each of the corporations were issued to the F. H. A.

The officers of both Kew Terrace and #2 Corp. were Morris Brecher, president; Charles K. Itchkow, vice president; and Alfred Wohl, secretary-treasurer. Each of the above-named officers was also a director of both Kew Terrace and #2 Corp.

On March 25 and April 27, 1949, Kew Terrace and #2 Corp., respectively, acquired by purchase from Kew Knolls, Inc., land for the F. H. A. apartment projects referred to herein. The total cost of the land for the projects was as follows:

| | Kew Terrace | #2 Corp. |
|---|---|---|
| Cost to Kew Knolls, Inc | $128, 914. 35 | $83, 808. 06 |
| Title expenses | 3, 207. 90 | 2, 196. 40 |
| Additional expenses to Jan. 31 and Mar. 31, 1950 | 38, 823. 86 | 25, 595. 69 |
| Total cost of land | 170, 946. 11 | 111, 601. 05 |

The stock of Kew Knolls, Inc., was owned by some of the petitioners.

On March 25 and April 27, 1949, the Manhattan Company (hereinafter referred to as Manhattan) agreed to lend both Kew Terrace and #2 Corp., respectively, $1,769,000 and $1,236,800, for the construction of the two projects. Kew Terrace and #2 Corp. each executed a mortgage note to the temporary lending institution, Manhattan, which was endorsed by the F. H. A.

On or about March 15, 1949, the Greenwich Savings Bank (hereinafter referred to as Greenwich) agreed to become permanent mortgagee upon the completion of the two projects. It further agreed to pay a total of $105,203 ($61,915 to Kew Terrace and $43,288 to #2

Corp.) as a premium (so-called mortgage premium payment) for the mortgagors' agreements to place their F. H. A.-insured mortgages with it.

Commencing on February 15, 1949, Kew Terrace and #2 Corp. entered into contracts with various suppliers and subcontractors for the construction of the two F. H. A. projects. Kew Terrace and #2 Corp. did not hire an independent contractor to construct the two projects. The corporations constructed the projects themselves, and subcontracted for substantially all of the work.

Petitioner Alfred Wohl, who was secretary and treasurer of the corporations, negotiated most of the contracts with the subcontractors and others were negotiated by petitioner Charles Itchkow, who acted as supervisor of construction. Both had personal knowledge of the progress of construction, the requisitioning of payments from the F. H. A. and mortgagee, and the payments to subcontractors.

As of August 31, 1949, the books and records of Kew Terrace and #2 Corp. indicated the probability that the actual costs of construction [5] would amount to approximately one-half million dollars less than the amount of F. H. A.-insured mortgages and the corresponding identical advances under the building loan agreements.

Construction of the Kew Terrace project was commenced about April 1, 1949. Certificates of occupancy for the 5 buildings comprising this project recited that these buildings were completed on August 29, 1949, August 29, 1949, September 19, 1949, September 30, 1949, and October 7, 1949, respectively. Occupancy of the apartments in the 5 buildings constituting this project began in August 1949. By December 1949 only 8 of the 210 apartments were vacant.

The audit of the income tax return of Kew Terrace for the fiscal year ended January 31, 1950, allowed depreciation on the buildings constituting the project to be taken commencing October 1, 1949.

Construction of the #2 Corp. project was commenced on April 1, 1949. Certificates of occupancy for the 4 buildings comprising this project recited that these buildings were completed on October 12, 1949, November 21, 1949, November 21, 1949, and December 2, 1949. Occupancy of these 4 buildings commenced in November 1949. By December of that year only 52 of the 150 apartments in the project were vacant.

The audit of the income tax return of the #2 Corp. for the fiscal year ended March 31, 1950, allowed depreciation on the 4 buildings to be taken commencing December 1, 1949.

The total costs to Kew Terrace and #2 Corp. for their respective projects were $1,559,718.09 and $1,066,945.27, itemized as follows:

---

[5] Not including cost of land.

|                                                                          | Kew Terrace     | #2 Corp.        |
|--------------------------------------------------------------------------|-----------------|-----------------|
| Land                                                                     | $170, 946. 11   | $111, 601. 05   |
| Construction                                                             | 1, 370, 896. 56 | 941, 802. 30    |
| Miscellaneous expenses (legal fees, insurance premiums, etc.)            | 17, 875. 42     | 13, 541. 92     |
| Total                                                                    | 1, 559, 718. 09 | 1, 066, 945. 27 |

The receipts from Manhattan under the building loan agreements for the two projects exceeded the total cost of the projects (including the cost of the land) by the sum of $379,136.64.

The receipts from Manhattan under the construction building loan agreements for the two projects exceeded actual construction costs by $693,101.14, computed as follows:

|                                                          | Kew Terrace      | #2 Corp.        | Total            |
|----------------------------------------------------------|------------------|-----------------|------------------|
| Proceeds of building loan agreement                      | $1, 769, 000. 00 | $1, 236, 800. 00 | $3, 005, 800. 00 |
| Construction costs                                       | 1, 370, 896. 56  | 941, 802. 30    | 2, 312, 698. 86  |
| Excess building loan proceeds over actual construction costs | 398, 103. 44  | 294, 997. 70    | 693, 101. 14     |

On January 26, 1950, the officers and directors of Kew Terrace met with their accountant and decided to make a cash distribution to its stockholders. On this date the board of directors of this corporation voted to increase the capital surplus of the corporation by the sum of $540,372.15, representing the difference between the original F. H. A. appraisal of the building and actual construction costs. The next day another meeting of the board of directors was held, at which time it voted a distribution in the amount of $270,000. On January 30, 1950, this amount was paid to petitioners as owners of all common stock. A second distribution in the amount of $58,000 was voted and paid to petitioners on August 17, 1951.

On February 16, 1950, the board of directors of #2 Corp. voted to increase the capital surplus of the corporation by the sum of $406,-183.73, representing the difference between the original F. H. A. appraisal of the building and the actual construction costs. The following day the directors met again, at which time a distribution in the amount of $192,000 was voted and paid to petitioners as owners of all the common stock. A subsequent distribution in the amount of $35,-000 was voted and paid to petitioners on August 17, 1951.

On February 16, 1950, the temporary lender, Manhattan, assigned the mortgage notes to Greenwich, the permanent mortgagee. Greenwich paid as a mortgage premium the sum of $105,203, $61,915 to Kew Terrace and $43,288 to #2 Corp. in accordance with the agreement of March 15, 1949.

The two corporations filed their Federal income tax returns on a fiscal year basis ending, respectively, January 31 and March 31. The

net income, or loss, of the two corporations, per returns as adjusted by the revenue agent for the fiscal years, was as follows:

| Year | Kew Terrace F/Y/E 1-31 | #2 Corp. F/Y/E 3-31 |
|---|---|---|
| 1950 | [1] $58, 948. 36 | [2] $22, 907. 13 |
| 1951 | 31, 164. 47 | 22, 078. 60 |
| 1952 | (5, 247. 48) | 653. 88 |
| 1953 | (8, 490. 81) | (3, 297. 00) |

[1] Including income from the mortgage premium in the amount of $61,915.
[2] Including income from the mortgage premium in the amount of $43,288.

The distributions by the two corporations, portions of which the parties agree are taxable as ordinary dividend income under section 22 (a), based on the corporations' earnings and profits, and the amounts in dispute are as follows:

| | Total distribution | Ordinary dividend income | Balance (amount in dispute) |
|---|---|---|---|
| *1950* | | | |
| Kew Terrace | $270, 000 | $36, 547. 98 | $233, 452. 02 |
| #2 Corp | 192, 000 | 17, 495. 99 | 174, 504. 01 |
| Total | 462, 000 | 54, 043. 97 | 407, 956. 03 |
| *1951* | | | |
| Kew Terrace | 58, 000 | 24, 201. 88 | 33, 798. 12 |
| #2 Corp | 35, 000 | 17, 225. 15 | 27, 774. 85 |
| Total (1951) | 93, 000 | 41, 427. 03 | 51, 572. 97 |
| Total (1950) | 462, 000 | 54, 043. 97 | 407, 956. 03 |
| Grand total | 555, 000 | 95, 471. 00 | 459, 529. 00 |

The amount of the distributions in dispute is attributable to the excess mortgage proceeds and the mortgage premium.

On February 11, 1953, petitioners agreed by written contract to sell their respective shares of Kew Terrace common stock to Leo Bercow. On August 18, 1953, petitioners agreed by written contract to also sell their respective shares of #2 Corp. common stock to Leo Bercow. Petitioners received $200,000 for the sale of the stock of the two corporations.

On November 8, 1954, 30-day letters from the district director of internal revenue, Brooklyn, New York, were mailed to both Charles and Sadie Itchkow and to Kenneth Itchkow, to which were attached reports of examination dated August 6 and September 21, 1954. It is stated as follows in each of the reports of examination:[6]

As a result of adjustments made in the examination of these corporations, an earned surplus was created in each of the years 1950 and 1951. Accordingly, a portion of each of the 1950 and 1951 distributions have been held to be taxable as an ordinary dividend to the extent of corporate earned surplus. The balance

---

[6] The report of examination attached to the letter to Charles and Sadie Itchkow is the exact wording except that "ordinary income" follows "(collapsible corporations)."

of the distributions are held to be taxable as ordinary income under Sec. 22 (a) or Sec. 117 (m) (collapsible corporations).

On December 2, 1954, petitioners Charles and Sadie Itchkow and petitioner Kenneth Itchkow filed protests to the deficiencies as proposed by the 30-day letters referred to above.

The petitioners stated in part as follows in said protests:

The Revenue Agent proposes to treat distributions which the taxpayer received from Kew Terrace, Inc. and Kew Terrace #2 Corporation as ordinary dividends under sections 115 (a) and 117 (m) I. R. C. and therefore, to tax said distributions as ordinary income under section 22 (a) I. R. C.

It is the taxpayer's contention that section 117 (m) is inapplicable in the instant cases; that section 115 (d) of the Code is the applicable section; and that the treatment of the distribution as capital gain by the taxpayer under the provisions of section 117 of the Code is correct.

On September 29, 1955, statutory notices of deficiency were mailed by the Appellate Division, Regional Commissioner, Internal Revenue Service, New York, New York, to both Charles K. Itchkow and Sadie Itchkow and to Kenneth Itchkow. It is stated as follows in each of the statements attached to said statutory notices of deficiency:

In making this determination of your income tax liability, careful consideration has been given to the report of examination * * *; to your protest dated December 2, 1954; and to the statements made at the conference held on June 23, 1955.

* * * * * * *

It is held that cash distributions to you from Kew Terrace Inc. and Kew Terrace #2 Corp. in the taxable years ended December 31, 1950 and 1951 are fully taxable to you as ordinary income under the provisions of the Internal Revenue Code of 1939 * * *

Kew Terrace and #2 Corp., the entire common stock of which was held by petitioners, were formed or availed of principally for the construction of two housing projects with a view to the realization by petitioners of gain attributable to such property through a distribution of cash to petitioners before the realization by Kew Terrace and #2 Corp. of a substantial part of the net income to be derived from the respective projects.

Petitioners realized gain upon the distribution to them on January 27, 1950, and February 17, 1950, of cash in the aggregate amount of $462,000, which gain (to the extent it exceeds the earnings and profits of the respective corporations, i. e., $407,956.03) is to be considered as gain from the sale or exchange of property which is not a capital asset in accordance with the provisions of section 117 (m) (1).

Petitioners realized gain upon the distribution to them on August 17, 1951, of cash in the aggregate amount of $93,000, which gain (to the extent it exceeds the earnings and profits of the respective corporations, i. e., $51,572.97) is to be considered as gain from the sale or exchange of property which is not a capital asset in accordance with the provisions of section 117 (m) (1).

OPINION.

KERN, *Judge:* We consider first the contention of the petitioners in Docket Nos. 60520 and 60521 that in those cases the respondent has the burden of proof with regard to the applicability of section 117 (m), I. R. C. 1939. Their argument is based upon the absence of any specific mention of section 117 (m) in the statutory notices of deficiency and the characterization of the cash distributions therein as "ordinary income." On the authority of *Leland D. Payne*, 30 T. C. 1044, we hold that the burden of proof with regard to the applicability (or nonapplicability) of section 117 (m) is on the petitioners in Docket Nos. 60520 and 60521 as it is on the petitioners in the other cases here before us. See also *Arthur Sorin*, 29 T. C. 959.

Petitioners argue that section 117 (m)[7] is inapplicable to the facts

---

[7] SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, or producing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

(B) For the purposes of subparagraph (A), a corporation shall be deemed to have manufactured, constructed, or produced property, if—

(i) it engaged in the manufacture, construction, or production of such property to any extent,

(ii) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, or produced the property, or

(iii) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, or produced by the corporation.

(3) LIMITATIONS ON APPLICATION OF SUBSECTION.—In the case of gain realized by a shareholder upon his stock in a collapsible corporation—

(A) this subsection shall not apply unless, at any time after the commencement of the manufacture, construction, or production of the property, such shareholder (i) owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation, or (ii) owned stock which was considered as owned at such time by another shareholder who then owned (or was considered as owning) more than 10 per centum in value of the outstanding stock of the corporation ;

(B) this subsection shall not apply to the gain recognized during a taxable year unless more than 70 per centum of such gain is attributable to the property so manufactured, constructed, or produced ; and

(C) this subsection shall not apply to gain realized after the expiration of three years following the completion of such manufacture, construction, or production.

For purposes of subparagraph (A), the ownership of stock shall be determined in accordance with the rules prescribed by paragraphs (1), (2), (3), (5), and (6) of section 503 (a), except that, in addition to the persons prescribed by paragraph (2) of that section, the family of an individual shall include the spouses of that individual's brothers and sisters (whether by the whole or half blood) and the spouses of that individual's lineal descendants.

of the instant cases because (a) both corporations had derived substantial net income at the time of the making of the distributions here in question, and (b) the intention of making the distributions did not arise until after the "construction * * * of property" by both corporations had been completed.

With regard to the first contention, petitioners have the burden of proving that both corporations had derived substantial net income at the time of the making of the distributions. In determining what is "a subtantial part of the net income to be derived from such property" we must consider the relationship between the net income realized by the corporations prior to the distributions and the whole of the net income which may be reasonably anticipated to be derived from such property. The fact that both corporations had any net income in their first fiscal years is the result of the receipt by them of so-called mortgage premiums. In our opinion such receipts did not constitute "net income to be derived from such property" within the meaning of section 117 (m) (2) (A) (i) when the property constructed by the corporations consisted of apartment buildings. Conceding that the corporations had "net income to be derived from such property" in their second fiscal years, we are unable to conclude that this was a substantial part of the whole of the net income reasonably to be anticipated from such properties. Obviously, the properties had a long useful life. This is shown by their depreciation schedules and by the fact that their mortgage loans were repayable over a period of 30 years. That the properties had a long-term income potential is shown by the sale of the common stock of the corporations in 1953 for $200,-000. Thus we conclude that the petitioners have failed to prove that the corporations had realized a substantial part of the net income to be derived from their properties prior to the distributions in question.

With regard to their second contention petitioners rely upon the fact that the construction of the properties here involved was completed during the latter part of 1949, and the fact, which they claim is established by the evidence, that the view to make the distributions here in question did not exist until the time of the actual distribution in January 1950. Therefore, petitioners conclude, the provisions of Regulations 111, section 29.117–11 (b), preclude a determination that the corporations are "collapsible" within the meaning of section 117 (m).

As proof of the nonexistence of the view to the distribution at any time during the construction, petitioners point to the testimony of Alfred Wohl, Charles Itchkow, and Morris Brecher. Alfred testified that while he was thoroughly familiar with all of the details of the construction, it was impossible to know that the corporations would have mortgage proceeds in excess of costs of construction until

all of the work was completed because of the possibilities of strikes, because of "the possibility of land conditions that were unanticipated, where you might not plan for piling and you have to pile," because the cost of advertising vacancies cannot be known, and because of other contingencies which he did not describe. He testified in answer to a question as to whether prior to January 26, 1950, he ever arrived at any intention to distribute any excess of mortgage proceeds over costs for the projects here involved: "I did not and could not by reason of the fact that I did not know what my total cost was." Prior to that testimony, he testified that on January 26, 1950, "[w]e did not know the exact cost of the project." He testified that prior to January 26 he never discussed with anyone "a surplus or existence of surplus of excess mortgage proceeds over costs," yet in earlier testimony he testified that about the middle of January Morris Brecher "talked to me about the possibility of going into another deal and the possibility of borrowing some available funds from the Kew Terrace Corporations." Obviously, the "available funds" as of the middle of January 1950 were the excesses of mortgage proceeds over costs.

Charles Itchkow, the vice president of the corporations and supervisor of construction on both projects, who had participated prominently in making the estimates submitted to the F. H. A., testified that prior to January 26, 1950, he never talked to any other director or stockholder concerning any distribution from either corporation. He further testified on direct examination as follows:

Q. Prior to that discussion coming at the end of January 1950, did you at any time contemplate that there might be any kind of distribution from either of the two corporations?
A. I was hoping there would be a——
Q. A distribution?
A. Well——
Q. A distribution is all that I asked about, Mr. Itchkow.
A. No.
Q. During the course of construction, from its commencement in each of the two corporations until the meeting which took place at the end of January in 1950, did you know that there would be any kind of surplus fund available in the corporation?
A. No.

On cross-examination he testified that he was not aware of the costs of the construction as the building progressed and, furthermore, that he was not even interested in them. Since this witness was not only an officer, stockholder, and director of the corporations but was also the supervisor of construction and an estimator of costs, this testimony is, to say the least, surprising.

Morris Brecher testified that although as an investor he was naturally interested in the costs of the projects and visited them every week or so, he was not aware that the costs of construction were

running below the amount of the mortgage. He also testified that he suggested a loan from funds of the corporations about the middle of January 1950 in order to make investments in other projects. If he was unaware of the anticipated excess of mortgage proceeds over costs, it is difficult to conceive what funds of the corporations Morris thought were available for "loans."

Thus, the testimony of the three officers and directors of the corporations presents the following picture: Although it was apparent by August 1949 that the costs of constructing the apartment buildings would be at least several hundred thousand dollars less than the mortgage proceeds (barring unforeseeable and unlikely contingencies), none of these officers and directors were aware of this and they gave no thought to and never discussed the possible existence of such a surplus, much less its distribution; and yet shortly after the physical completion of the buildings but before the final ascertainment and liquidation of all the costs, and upon the casual inquiry of one of the officers concerning the possibility of obtaining a loan from the funds of the corporations, a meeting of the three directors was held, at which the existence of the surplus became known and was discussed for the first time and the first and principal distributions here in question were immediately authorized.

In our opinion, the self-serving testimony of the three petitioners who testified, which in several instances is inconsistent in itself and in general "strains our credulity" as inconsistent with other facts of record, gives a distorted and inaccurate picture. In our opinion, these petitioners, as reasonably prudent businessmen and experienced real estate operators and constructers, considered the probability of an excess of mortgage proceeds over actual costs and the possibility of a distribution therefrom before the physical construction was completed, but delayed the making of any distribution until the amount of such excess could be determined with some degree of accuracy. Therefore, we reject the testimony of these petitioners and conclude that petitioners have failed to prove that the "view to * * * distribution" did not exist at any time during the construction, bearing in mind that "view to * * * distribution" includes within its meaning the contemplation by persons in a position to determine the policies of corporations of such a distribution "as a recognized possibility." Regs. 111, sec. 29.117–11 (b). Certainly there is no proof that the "distribution is attributable solely to circumstances which arose after the * * * construction." *Ibid.*

Since the Court of Appeals for the Second Circuit has recently indicated in *Glickman* v. *Commissioner*, 256 F. 2d 108, its concurrence in the opinion of the Court of Appeals for the Fourth Circuit in *Burge* v. *Commissioner*, 253 F. 2d 765, to the effect that "[i]t is sufficient that [the view] exist when the corporation is 'availed

of'" and "the corporation may at any time during its corporate life be 'availed of' for the proscribed purpose" regardless of the time of completion of construction in relation to the time of the existence of the view, this argument of petitioners would not be of avail to them even if we were to accept the testimony of these witnesses as accurate.

Petitioners make a further argument to the effect that even though the corporations are deemed collapsible corporations within the meaning of section 117 (m), only a portion of the cash distributions made by them is taxable under that section because such distributions (to the extent that they were not ordinary dividends paid from current earnings) were in amounts less than the excess of the mortgage proceeds over the "total cost of construction." The fallacy in this argument lies in the fact that petitioners have included in the "total cost of construction" the cost of the land. On the authority of *Elizabeth M. August*, 30 T. C. 969, this argument is rejected.

Upon the issues presented in these proceedings, we decide in favor of the respondent for the reasons above stated.

*Decisions will be entered under Rule 50.*