### E. J. ZONGKER AND CHARLEEN ZONGKER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 82847.   Filed March 26, 1963.

*Wayne Coulson, Esq.,* and *Willard B. Thompson, Esq.,* for the petitioners.

*Claude R. Sanders, Esq.,* for the respondent.

FISHER, *Judge:* Respondent has determined deficiencies in petitioners' income tax and liability for additions to tax under section 294(d)(1)(A), section 294(d)(2), Code of 1939, and section 6651(a), Code of 1954, for the calendar years 1953 and 1955 as follows:

| Year | Deficiency | Additions to tax, 1939 Code | | Addition to tax, 1954 Code |
| --- | --- | --- | --- | --- |
| | | Sec. 294(d)(1)(A) | Sec. 294(d)(2) | Sec. 6651(a) |
| 1953 | $24,238.04 | $2,278.48 | $1,488.98 | |
| 1955 | 3,536.19 | | | $176.81 |

The questions in issue are: (1) Whether petitioners' gain in 1953 from the sale of the stock of a corporation in which they owned a one-half interest is taxable as capital gain or whether the corporation was a collapsible corporation within the meaning of section 117(m), Code of 1939, so that the gain is taxable as ordinary income; (2) the value at the date of such sale of a one-half interest in a tract of land which was transferred to petitioners at its book value as part consideration for their stock; and (3) whether petitioners are liable for the proposed additions to tax.

Some of the facts have been stipulated.

The stipulated facts are found accordingly.

Petitioners are husband and wife and are residents of Wichita, Kans. They filed joint income tax returns for 1953 and 1955 with the district director of internal revenue at Wichita, Kans.

In 1952 petitioners became the owners of a one-half interest in the Park City Development Company, Inc., a corporation newly organized to engage in a real estate development known as Park City Addition, located in Sedgwick County about 3 miles north of Wichita, Kans.

The Park City Development Company, Inc. (hereinafter sometimes referred to as the corporation), was organized July 22, 1952. Its purpose, as stated in its articles of incorporation, was:

The purchase, platting, developing, and subdividing of real property, and the sale, conveyance, and/or mortgaging thereof and all acts necessary and incidental to carry out and effectuate the above purpose.

The corporation's capital stock was issued, 100 shares to petitioner, E. J. Zongker, 20 shares to his wife, Charleen Zongker, 80 shares to Donald Morris, and 40 shares to Geneva Morris, wife of Donald. The officers of the corporation, who also served as directors, were E. J. Zongker, president, Donald Morris, vice president, and Geneva Morris, secretary. E. J. Zongker and Donald Morris, with another associate, Orley H. Zongker, were also the organizers of Park City Improvement District, a municipal corporation, organized July 25, 1952.

Park City Development Company, Inc., commenced business in February 1953. On February 2, 1953, it acquired an option to purchase 100 acres of farmland located 3.7 miles north of Wichita for $52,000. The option was to expire August 1, 1953, unless exercised on or before that date. The tract was platted in April 1953. It contained 474 residential lots and a commercial area of approximately 16 acres.

It was the intention of the corporation's organizers to sell off the residential lots and hold the commercial acreage for later development. They did not intend that the corporation engage in the construction of houses on the residential lots.

On January 28, 1953, the corporation entered into a contract to sell to three individuals, J. E. Ahlf, C. G. Owens, and Lloyd E. Forsse, 100 of the residential lots for $500 each, with an option to purchase 192 additional lots at the same price and also an option to purchase a 20-percent interest in the 16-acre commercial tract for $3,125 per acre. By supplemental contract dated June 10, 1953, the corporation agreed to sell to the same parties (hereinafter sometimes referred to as the purchasers), 100 additional lots for $400 each. In each instance the

sale of the lots was to be conditioned upon "the letting of proper contracts for the construction and installation of sewer, and gas and water utilities and the curbing and guttering and surfacing of streets, on or before the 15th day of August 1953." The corporation agreed to use the proceeds from the sale of the additional 100 lots as a partial deposit on the gas utility. The total deposit required was approximately $52,000.

By further agreement dated August 7, 1953, which was said to supersede the previous agreements, the purchasers agreed to pay the balance of the purchase price for the first 200 lots, $54,000, by depositing the balance required by the gas company and paying the remainder in cash to the corporation. The purchasers further agreed to give the corporation a promissory note for $40,000 which was to be paid out of the refunds of the gas deposits. It was further agreed that the purchasers should have an option to purchase 200 lots at a price of $500 each, the purchasers to pay all taxes and special assessments thereon incurred after January 1, 1954. This option was to run to July 15, 1954. The purchasers were also given the option to purchase a 20-percent interest in the 16-acre commercial tract for $3,125 per acre.

Pursuant to the agreement of August 7, 1953, the purchasers deposited $52,233 with the gas company and paid the corporation $1,767. The gas company had previously entered into an agreement with a partnership composed of Ahlf, Owens, and Forsse to construct a gas line to supply Park City Addition. The gas company agreed to refund the $52,233 deposit at the rate of $249.40 as each residence was connected for gas service.

On July 17, 1953, the purchasers paid the corporation $36,000 in cash to apply on the purchase price of the lots which it had acquired. The corporation in turn paid this amount over to the fee owners and received a deed to the entire property, except for a 16-acre tract which was to be acquired by Park City Improvement District as the location for a sewage disposal system. At the same time, petitioner and Donald Morris agreed individually that if Park City Improvement District did not acquire the property it would pay the balance of the purchase price of the entire 100-acre tract, $16,000, out of the proceeds for the refund of the gas deposits or the sale of lots.

On November 16, 1953, petitioner and his wife and Donald Morris and his wife sold all the corporation's stock, i.e., 240 shares of common stock, to Ahlf, Owens, and Forsse for a stated price of $78,574.48. In determining the sales price of the stock all of the corporation's assets were valued at book value, except that the remaining 274 residential lots were valued at $382 each. The sales price of $78,574.48 was computed as follows:

Net worth of the corporation at book value:

| | | |
|---|---:|---:|
| Capital stock | $24,000.00 | |
| Surplus | 9,100.94 | |
| | | $33,100.94 |
| Value of residential lots | 104,688.00 | |

Real estate at book value:

| | | |
|---|---:|---:|
| Developed real estate account | $42,791.58 | |
| Purchase contract account | 24,000.00 | |
| | 66,791.58 | |
| Less commercial tract at book value | 7,597.12 | 59,194.46 |

| | |
|---|---:|
| Excess of value of 274 residential lots at $382 per lot over book value | 45,473.54 |
| Sales price of stock | 78,574.48 |

The corporation had assets, at book value, and liabilities at November 16, 1953, as follows:

#### ASSETS

Current Assets:

| | | |
|---|---:|---:|
| Cash | $146.87 | |
| Option to purchase from R. A. Morris | 24,000.00 | |
| Accounts receivable | 63.33 | |
| Developed real estate lots | 35,194.46 | |
| Commercial area | 7,597.12 | $42,791.58 |
| Current Assets | | $67,001.78 |

Other Assets:

Deposits:

| | | | |
|---|---:|---:|---:|
| Gas | 52,233.00 | | |
| Electric | 200.00 | 52,433.00 | |
| Organization Expense | | 280.00 | 52,713.40 |
| | | | 119,715.18 |

#### LIABILITIES AND CAPITAL

| | | |
|---|---:|---:|
| Notes payable | $5,500.00 | |
| Accounts payable—trade | 24,483.00 | |
| Due officers | 5,982.50 | |

Accrued items:

| | | |
|---|---:|---:|
| Salaries | $45,771.78 | |
| County and local taxes | 402.42 | |
| Payroll taxes | 108.00 | |
| Income taxes | 4,173.02 | 50,455.22 |
| Total current liabilities | | 86,420.72 |
| Capital stock—240 shares common | 24,000.00 | |
| Surplus—earned profit for current period | 9,294.46 | |
| Total capital and surplus | | 33,294.46 |
| | | 119,715.18 |

The above asset item "developed real estate," $42,791.58, represented the cost of the land plus the cost of engineering and improvements. Under liabilities, the note payable of $5,500 represented money borrowed by the corporation. The "accounts payable—trade" item of $24,483, represented costs of grading, engineering, bank financing, abstracts, and other services. The item "due officers" $5,982.50, represented money advanced by the officers for development costs. The accrued salaries of $45,771.78, represented the amounts due petitioner and Morris as compensation for serving as the corporation's president and vice president, respectively.

Soon after they purchased the stock the purchasers loaned the corporation $37,195.38 which was used to pay the compensation accrued to petitioner and Morris. Thereafter, early in 1954, the corporation was dissolved and the remaining unsold lots were transferred to four other corporations owned by the purchasers. These corporations built houses on 380 of the lots and sold 84 lots to other builders. Of these 84 lots, 17 were sold at $700 each, 10 at $750 each, and 6 at $800 each. These sales were arm's-length transactions which reflected the true market value of the lots at the time of the sales. Fifty other lots were transferred to interests owned by Ahlf, Owens, and Forsse for $400 each.

Contemporaneously with the sale of the corporation's stock, and as part of the consideration therefor, petitioner and Donald Morris were each given an option to purchase a one-half interest in the 16-acre commercial tract for $3,798.56, one-half of its then book value. Petitioner and Morris both exercised their options and each acquired a deed to a one-half interest in the property. On December 8, 1953, the Morrises sold their one-half interest in the tract to the purchasers for $30,000. Early in 1954, petitioners sold their one-half interest in the tract to the purchasers for $8,000, plus 25 percent of the capital stock of a new corporation, Park City Investment Co., Inc., which was organized by the purchasers to take title to the entire 16-acre tract. This was the corporation's only asset. The $8,000 purchase price was not received by the petitioners until 1959 after they had brought suit for its collection.

Various improvements in the subdivision were contracted for by the corporation or by petitioner and his associates during 1953 and were completed during 1954. A water supply and distribution system was completed January 1, 1954, a sewage plant and sewage lines were completed in March 1954, and street improvements were completed in July 1954. The costs of the improvements were assessed against the property and were paid for, ultimately, by the purchasers of the lots.

. In its income tax return for 1953, the corporation reported gross sales (from the sale of 200 residential lots) of $90,000, a gross income,

after the deduction of costs of goods sold, of $60,818, deductions of $47,816.65, and a net income of $13,001.35. The deductions included the $45,771.78 of accrued officers salaries.

Special assessments were certified or "spread" against the Park City Addition properties during 1954 and 1955 as follows:

| Type of assessment | Amount | | Date certified to the County Clerk and/or spread |
|---|---|---|---|
| | Per lot | Commercial area | |
| Water | $378.57 | $20,822.77 | Certified Aug. 23, 1953. Spread, 1954. |
| Street | Based on number of feet fronting on street. | 18,288.80 | Not certified. Spread, 1955. |
| Sewer | $273.07 | 15,016.96 | Not certified. Spread, 1955. |
| Total special assessment on commercial area. | | 54,128.53 | |

Respondent determined in his notice of deficiencies that petitioners realized ordinary income from the sale of their Park City Development Company, Inc., stock of $40,000, computed as follows:

```
Cash payment on purchase of stock_____  $10,000.00
Cancellation of obligation to pay on purchase of realty_____    3,798.56
Exercise of option to purchase undivided one-half in-
   terest in commercial tract of a fair market value of_  $30,000.00
Less: Purchase price of such undivided one-half
   interest  _____   3,798.56   26,201.44
                                                               _____
                                                                40,000.00
```

The fair market value of the 16-acre commercial tract at November 16, 1953, was $35,000.

Petitioners filed a declaration of estimated tax for 1953 on January 15, 1954, showing an estimated income tax of $6,708.80. They filed a joint income tax return for 1953 on September 17, 1954, showing an income tax liability of $7,252.74. Their income tax return for 1955 was filed November 15, 1956.

Respondent has determined that petitioners are liable for additions to tax under section 294(d)(1)(A), Code of 1939, for failure timely to file a declaration of estimated tax for 1953, an addition to tax under section 294(d)(2) for substantial understatement of estimated tax for the same year, and an addition to tax under section 6651(a), Code of 1954, for failure timely to file an income tax return for 1955.

OPINION.

The first and principal issue here is whether Park City Development Company, Inc., was a "collapsible corporation" within the mean-

ing of section 117(m)(1), (2)(A), Code of 1939,[1] as determined by respondent, so that the gain from the sale by petitioners of their stock in the corporation is taxable under section 117(m)(1) as ordinary income rather than as capital gain.

Petitioners contend that section 117(m) is inapplicable because a substantial part of the net income to be derived from the Park City Addition real estate development, which was the corporation's only source of income, had been realized at the time of their sale of the stock. In support of this contention petitioners rely on the interpretation of section 117(m) by this Court that the term "substantial part" as used in the statute relates to the income already realized at the time of the sale, as compared with the whole amount of income reasonably to be expected. *Rose Sidney*, 30 T.C. 1155 (C.A. 2, 1960), affd. 273 F. 2d 928; *James B. Kelley*, 32 T.C. 135 (C.A. 5, 1961), affd. 293 F. 2d 904.

At November 16, 1953, the corporation had sold 200 residential lots but still held 274 residential lots and the 16-acre commercial tract. On the sale of the 200 lots it had realized a gross profit, after cost of goods sold and abstract expenses, of approximately $60,118, and a net profit of approximately $13,000 after deductions of approximately $47,816.65. The deductions of $47,816.65 included "officers' salaries and bonuses" of $45,771.78 which had not been paid for lack of funds. The corporation then had only a small amount of cash ($146.87) and no readily available funds. Two hundred of the remaining 274 lots were optioned to the purchasers at $500 each. They were all valued at an average of $382 each in the sales agreement of November 16, 1953.

Assuming that the sale of the remaining 274 lots would have produced the same proportional gross and net income as did the prior

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

(m) COLLAPSIBLE CORPORATIONS.—

(1) TREATMENT OF GAIN TO SHAREHOLDERS.—Gain from the sale or exchange (whether in liquidation or otherwise) of stock of a collapsible corporation, to the extent that it would be considered (but for the provisions of this subsection) as gain from the sale or exchange of a capital asset held for more than 6 months, shall, except as provided in paragraph (3), be considered as gain from the sale or exchange of property which is not a capital asset.

(2) DEFINITIONS.—

(A) For the purposes of this subsection, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in subsection (a)(1)(A), or for the holding of stock in a corporation so formed or availed of, with a view to—

(i) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, prior to the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the net income to be derived from such property, and

(ii) the realization by such shareholders of gain attributable to such property.

sale of the 200 lots, the result would be post-November 16, 1953, gross income of approximately $83,300 and net income of approximately $18,326. Adding to the gross income from the sale of the 274 lots, the value over cost of the 16-acre commercial tract of $27,503 ($35,000 less cost, $7,597.12), would give a postsale gross income of approximately $110,800 and a net income of approximately $24,376. The total net income reasonably to be expected by the corporation would be approximately $37,377. The presale net income of approximately $13,000 is more than 34 percent of the expected income.

Even placing a sale value of $500 each on the 274 unsold lots would yield a postsale net income of $46,168 and leave the presale net income more than 23 percent of the total income from the project.

No case is cited, and we find none, where more than 20 percent of total net profits has been held insubstantial. See *G. A. Heft*, 34 T.C. 86 (C.A. 5, 1961), affd. 294 F. 2d 795, where less than 17 percent of the total expected income realized at the time of the distributions was held to be a substantial part of the total income.

There is nothing in the evidence to indicate that at the time of the sale of the corporation's stock by petitioners there was in prospect any marked improvement in business conditions which might favorably affect the corporation's sales or profits. It was petitioners' testimony that he had unsuccessfully tried to find purchasers for the 74 unoptioned lots before selling the stock. Under no reasonable approximation of the postsale anticipated net income of the corporation could a figure be reached in comparison with which the presale income would have to be regarded as less than substantial. We therefore conclude that Park City Development Company, Inc., was not a collapsible corporation within the meaning of section 117(m).

With this disposition of the issue, it is unnecessary for us to consider petitioners' further contention that section 117(m) is inapplicable because of the absence of the proscribed "view." *Maxwell Temkin*, 35 T.C. 906.

The second issue involves the determination of the value of the 16-acre commercial tract at November 16, 1953, to be used as a basis for computing petitioners' gain on the conveyance to them on that date of a one-half interest in the tract under the option agreement of November 16, 1953, for $3,798.56. Ascribing a value of $60,000 to the entire tract, respondent determined that petitioners' gain on the acquisition of their one-half interest therein was $26,201.44, the excess of the value of such one-half interest over petitioners' cost of $3,798.56.

As indicated above, we think that a valuation at November 16, 1953, of $60,000 for the 16-acre tract is excessive. This tract was never intended to be sold by the corporation but was to be held for com-

mercial development. As an income-producing property it held but little promise at November 16, 1953, or later. On that date it was wholly undeveloped and unproductive. It had no foreseeable income-producing potential. After the purchasers acquired title to the tract in 1954 they divided it into two lots and deeded one of them to another corporation, which they also owned, in consideration for that company's agreement to construct a building on the property. The remaining parcel of about 9.7 acres is still undeveloped and has taxes and special assessments against it in excess of its present value. There is an annual tax charge of $4,226.95 which has not been paid. Petitioners have never realized any income from their stock in Park City Company, Inc., which still holds title to the property, and the stock is now worthless. A shopping center and parking lot were built on the parcel which the purchasers transferred to another of their corporations, but in an appraisal made of that property in 1958, the rentals from the improvements were shown to be insufficient to support the costs of the improvements alone, leaving no return of income from the land itself. Based on a capitalization of its future income-production, after the addition of certain other nonexisting improvements, the land was valued at $27,900. A prospective value of $10,000 was ascribed to the remaining 9.7 acres of the original tract. This appraisal, although made over 4 years after November 16, 1953, tends to support petitioners' contention that at no time here material did the 16-acre tract have a value of $60,000 as determined by the respondent.

We have found, on the evidence as a whole, that the fair market value of the 16-acre tract on November 16, 1953, was $35,000.

The only objection offered by petitioners to the assessment of any of the additions to tax referred to above is that such additions cannot be assessed both for failure to file a declaration of estimated tax for 1953 under section 294(d)(1)(A) and for a substantial understatement of tax for the same year under section 294(d)(2). In support of their contention, they rely solely upon the decision of the Supreme Court in *Commissioner* v. *Acker*, 361 U.S. 87. In that case the Court held that the penalty for underestimation could not be imposed where no declaration of an estimated tax for that year had ever been filed. Its reasoning was that the failure to file a declaration of estimated tax could not be taken as the equivalent of a declaration showing an estimated tax of zero. The rule of that case does not apply here where a declaration of tax for 1953 was actually filed, although belatedly. We so held in *Rose S. Harkins*, 33 T.C. 365. See also *Bryan* v. *Commissioner*, 281 F. 2d 238; *Stellor* v. *United States*, 287 F. 2d 588, (Ct. Cl.). Respondent's determination on this issue is sustained.

*Decision will be entered under Rule 50.*