F.T.S. ASSOCIATES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5331–68. Filed May 3, 1972.

*Martin Rubashkin*, for the petitioner.
*Harvey R. Poe*, for the respondent.

QUEALY, *Judge:* The respondent determined a deficiency in income tax for the taxable year 1965 in the amount of $36,360.22. The only issue for decision is whether petitioner is entitled to exclude from taxable income the gain realized upon the sale of all its assets in the year 1965 pursuant to section 337 of the Internal Revenue Code.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner was a New York corporation whose principal place of business was Ferndale, N.Y. Petitioner filed its Federal income tax return for the calendar year 1965 with the district director of internal revenue, Albany, N.Y., on September 16, 1966. Petitioner was incorporated on February 7, 1962, under the name of International Process and Product Development Corp. which was thereafter changed on November 23, 1965, to F.T.S. Associates, Inc.

Petitioner was formed to develop and sell a disposable toothbrush (called Tush) which was patented by one Spencer Lutz who assigned his patent rights to petitioner on February 28, 1962. From the date of its incorporation, petitioner sought to develop and perfect such a toothbrush.

Petitioner held two patents relating to the product, mechanical patent No. 3,124,824 issued March 1964 and a design patent No. 197,952 issued April 1964. Petitioner had, in addition, applied for patents in Canada, England, France, Spain, Italy, Japan, and the Scandinavian countries.

In the early part of 1962, petitioner's president and a principal shareholder, Leo Blank, consulted with Jerome Kelley, an experienced advertising and marketing executive, in regards to the market-

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

ing of Tush. Thereafter in 1964, Mr. Kelley became executive vice president of petitioner. Petitioner then engaged the services of Hazard Advertising Co. to handle the promotion of Tush.

From the outset, it was realized that petitioner did not have the necessary financing to market that product nationally. Therefore, petitioner decided upon an area-by-area marketing campaign anticipating that each specific area entered would generate enough revenues to fund the next marketing campaign.

The Boston area was selected for the initial marketing effort. A cost projection for the Boston campaign to begin in April 1965 was between $20,000 and $30,000.

In the early part of 1965, petitioner began contacting major distributors in the Boston area. About 98 percent of the distributors contacted said that they would handle the product. Petitioner also sent a questionnaire, along with a sample of the product, to 3,000 dentists in the New England area.

In April of 1965, a large-scale marketing campaign was then initiated in the Boston area, including the utilization of television by airing commercials for 13 weeks over 134 spots on three major networks in New England. As a result, orders were received from a substantial number of distributors in the area, who in turn placed the product in various retail outlets. However, by June 1965, it became apparent that the public was not buying the product in the volume anticipated. Petitioner began to experience "returns" from the distributors and had difficulty in collecting its accounts. Petitioner's total gross receipts from 1965 sales were $14,328.85.

In July 1965, the petitioner's accountant notified its management that the petitioner was insolvent and that it was continuing to lose money. Petitioner thereupon ceased all operations. In August of 1965, petitioner's principals decided that petitioner would have to go out of business.

Following the decision to discontinue the business, negotiations for the sale of petitioner's assets were had with one Oscar Alvareztorre, who had a marketing scheme to sell the product in vending machines. As a result of such negotiations, Alvareztorre offered to purchase all of petitioner's properties for a stated consideration of $205,000, together with a royalty of 5 percent on gross sales of the toothbrush.

On October 18, 1965, petitioner's board of directors adopted a resolution authorizing sale of petitioner's assets and the liquidation of petitioner.

Pursuant to an agreement dated October 20, 1965, petitioner sold all of its assets to Alvareztorre, receiving in exchange the sum of $40,000 in cash together with certain assets at an agreed valuation.[2]

---

[2] While the consideration of $205,000 consisted partly of cash and partly of certain property, the parties accepted the property at the stated values, and for purposes of this decision, we must assume that the petitioner agreed to sell its assets for $205,000.

Alvareztorre spent about 2 weeks working with the product at petitioner's premises in Ferndale, N.Y., and then abandoned further efforts to manufacture the toothbrush. The tangible materials and equipment which petitioner sold to Alvareztorre have at all times following the sale remained on the petitioner's premises in Ferndale, N.Y.

The complete liquidation of petitioner and the distribution of all its properties to its shareholders were accomplished on or prior to October 17, 1966, and petitioner was dissolved on November 8, 1967.

The shareholders receiving a distribution in liquidation from petitioner during the year 1966, the respective amounts received, and the gain realized therefrom, are as follows:

| Name of shareholder | Amount received | Gain realized |
| --- | --- | --- |
| Leo Blank | $30, 764. 05 | $23, 144. 56 |
| Bernard Blank | 30, 764. 04 | 23, 144. 56 |
| Irving Miller | 30, 764. 04 | 23, 144. 57 |
| | 92, 292. 13 | 69, 433. 69 |

The gain realized was reported on their respective Federal income tax returns for the taxable year 1966. A partnership composed of Leo Blank, Bernard Blank, and Irving Miller reported on its return for the taxable year 1966 an additional gain on liquidation of petitioner in the amount of $1,202.34.

The petitioner had a loss from operations in the amount of $60,832.49 for the 9-month period ended September 30, 1965. The petitioner did not realize any income from operations for the taxable years 1962, 1963, 1964, or 1965. The petitioner did not realize any net income from the sale of the product Tush.

In its return for the taxable year 1965, the petitioner reported a gain of $145,968.24 on account of the sale of its assets and signified thereon its election to exclude said amount from taxable income pursuant to section 337.

### OPINION

Petitioner was organized in 1962 to develop and market a disposable toothbrush. Following a period of development, the petitioner was ready to market the product in the spring of 1965. Since petitioner did not have sufficient funds to market the product nationally, it selected the Boston area for its initial sales effort. While petitioner unquestionably had reason to believe that its efforts would meet with success, the facts proved otherwise. Notwithstanding the expenditure of a

considerable sum for the promotion and distribution of the product in the Boston area, it developed that the product did not sell well. By July 1965, petitioner had exhausted its resources, was insolvent, and had ceased all business operations.

Not long thereafter, petitioner's principal shareholders apparently were able to convince one Oscar Alvareztorre that the disposable toothbrush could be successfully exploited. After some negotiations, in October 1965, Alvareztorre agreed to pay the equivalent of $205,000 for all of the assets of the petitioner, including the right to manufacture and market the product. In addition, he agreed to pay the petitioner a royalty of 5-percent gross sales.

On October 18, 1965, the petitioner adopted a plan of liquidation. Pursuant to that plan, on October 20, 1965, its assets were sold to Alvareztorre. The petitioner realized a gain of $145,968.24 on account of that sale.

On its return for the taxable year 1965, the petitioner elected to avail itself of the nonrecognition provisions of section 337 and excluded from its income the gain realized from the sale of its assets. Respondent determined that petitioner was a "collapsible corporation," as defined in section 341 and therefore did not qualify under section 337.

Section 337(a) provides for the nonrecognition of gain or loss by a corporation in liquidation on account of the sale of its assets if the corporation adopts a plan of complete liquidation and within 12 months thereafter sells or distributes all of its assets. Respondent concedes that the petitioner has met the conditions set forth in section 337(a). However, respondent contends that the reported gain in the amount of $145,968.24 should be recognized by petitioner in the taxable year 1965 inasmuch as petitioner was a collapsible corporation as defined by section 341(b) and that the nonrecognition provisions of section 337(a) are therefore not applicable. Thus, while the issue presented for decision is whether petitioner is entitled to exclude the gain realized on the sale of Tush from taxable income, a decision with respect to that issue turns on the question whether petitioner is a "collapsible corporation" as defined in section 341(b).

Insofar as material herein, section 341(b) defines a "collapsible corporation," as follows:

SEC. 341(b). DEFINITIONS.—

(1) COLLAPSIBLE CORPORATION.—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—

(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and

(B) the realization by such shareholders of gain attributable to such property.

(2) PRODUCTION OR PURCHASE OF PROPERTY.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—

(A) it engaged in the manufacture, construction, or production of such property to any extent,

(B) it holds property having a basis determined, in whole or in part, by reference to the cost of such property in the hands of a person who manufactured, constructed, produced, or purchased the property, or

(C) it holds property having a basis determined, in whole or in part, by reference to the cost of property manufactured, constructed, produced, or purchased by the corporation.

In our opinion, until the time of the failure of the Boston marketing effort, petitioner had not manufactured, constructed, or produced any property with a view to the sale of its stock or of the property so produced before the realization of a substantial part of any taxable income or gain "to be derived from such property" within the meaning of section 341(b)(1).

Petitioner was formed to develop and sell a disposable toothbrush under the trade name "Tush," the initial rights to which were purchased from a third party. The petitioner spent a couple of years on development work and on the design of the manufacturing processes. It reached production stage early in 1965. Petitioner thereupon commenced the production of the disposable toothbrushes and launched a marketing campaign in the Boston area. Admittedly, this proved to be a failure. The petitioner's resources had been exhausted, and it had ceased to do business.

At this point, an opportunity arose to dispose of petitioner's assets. To the extent that there was any gain, it must necessarily be attributed to the right to market the product rather than any inventory or fixed assets. The respondent concedes that the petitioner did not purchase that right with the view set forth in section 341(b)(1). Rather, as stated in respondent's brief, "the issue before the Court is the production and manufacture of property, 'Tush', not the purchase of 'Tush' by petitioner."

While it must be admitted that once petitioner had received an offer from Alvareztorre to purchase the assets of the business, the plan of liquidation under section 337 was adopted in order to avoid the tax on the resulting gain to the corporation, the presence of such intent is of no consequence. The proscribed intent arose *after* the cessation of

business activity by the petitioner. The respondent's regulations provide that the proscribed intent must have existed at the time the property was purchased or during the time property was being manufactured, constructed, or produced. Sec. 1.341–2(a)(3), Income Tax Regs.[3] While courts may have expressed some reservation with respect to the validity of this interpretation of the statute,[4] we are inclined to accept it.

It must be remembered that section 341 was added to the Internal Revenue Code upon the recommendation to close what was thought to be a "loophole" in the existing law.[5] It would hardly be proper for this Court to extend the applicability of such provision beyond that contemplated by its proponents. Further, if the application of section 341 were intended to be "automatic," that is, to flow necessarily from the act of the corporation in making a distribution of property to its shareholders to avoid the tax on a proposed sale, Congress could have so provided in simple terms. We must assume, therefore, that for the tax to apply, the proscribed "view" must have existed either at the time that the property was purchased (in the case of a purchase), or at the time that the property was constructed, etc., if the gain realized might be attributable to such activity. Here, neither condition has been satisfied.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

[3] (3) A corporation is formed or availed of with a view to the action described in section 341(b) if the requisite view existed at any time during the manufacture, production, construction, or purchase referred to in that section. Thus, if the sale, exchange, or distribution is attributable solely to circumstances which arose after the manufacture, construction, production, or purchase (other than circumstances which reasonably could be anticipated at the time of such manufacture, construction, production, or purchase), the corporation shall, in the absence of compelling facts to the contrary, be considered not to have been so formed or availed of. However, if the sale, exchange or distribution is attributable to circumstances present at the time of the manufacture, construction, production, or purchase, the corporation shall, in the absence of compelling·facts to the contrary, be considered to have been so formed or availed of.

[4] See, e.g., *Glickman* v. *Commissioner*, 256 F. 2d 108 (C.A. 2, 1958) ; *Burge* v. *Commissioner*, 253 F. 2d 765 (C.A. 4, 1958). But cf. *Jacobson* v. *Commissioner*, 281 F. 2d 703 (C.A. 3, 1960), reversing 32 T.C. 893 (1959) ; *Payne* v. *Commissioner*, 268 F. 2d 617 (C.A. 5, 1959).

[5] See H. Rept. No. 2319, 81st Cong., 2d Sess. (1950), 1950–2 C.B. 449.