MANASSAS AIRPORT INDUSTRIAL PARK, INC., A DISSOLVED CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 9166-72.     Filed June 24, 1976.

*Fred R. Tansill* and *Paul S. Richter,* for the petitioner.
*J. Doyle Tumbleson,* for the respondent.

GOFFE, *Judge:* The Commissioner determined a $143,064.22 deficiency in petitioner's Federal income tax for its taxable year ended March 31, 1969. The issues for decision are:

(1) The proper method of allocating the cost of constructing a road between three parcels of land adjacent to the road;

(2) Whether petitioner is a collapsible corporation as defined by section 341(b) of the Internal Revenue Code of 1954 and precluded thereby from the nonrecognition benefits of section

337(a) by section 337(c)(1)(A);[1]

(3) If petitioner is not a collapsible corporation, whether it sold substantially all of its property held primarily for sale to customers in the ordinary course of its trade or business "to one person in one transaction" as provided for in section 337(b)(2) and is therefore entitled to the nonrecognition benefits of section 337(a).

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated by this reference.

Petitioner Manassas Airport Industrial Park, Inc. (hereinafter petitioner), was a Virginia corporation organized on November 27, 1964, and dissolved by the Virginia Corporation Commission on February 5, 1970. At the time of the filing of their petition, the principal place of business of petitioner's successors in dissolution was Manassas, Va. Petitioner employed the accrual method of accounting in maintaining its books and records and in filing its corporate Federal income tax returns which covered taxable years ending March 31.

Early in 1964, E. W. Hurst, Jr., approached the ultimate shareholders of petitioner to interest them in the purchase of a parcel of real estate known as the Hurst Farm. The Hurst Farm consisted of 165.8 acres of land on which several farm buildings and a farmhouse were located. It was operated as a general dairy farm and the land was unimproved pastureland zoned for agricultural use. In May 1964, petitioner's eventual shareholders entered into a contract to purchase the farm. The contract was conditioned upon rezoning the property for industrial use which was accomplished in June of 1964. Petitioner was organized in the latter part of 1964 and the contract rights to the farm were assigned to it along with cash in exchange for its stock. Petitioner's charter authorized capital stock of 15,000 shares at $10 per share. The initial shares were issued for the following cash consideration:

---

[1] All section references are to the Internal Revenue Code of 1954, as amended.

| Shareholder | No. of shares | Cost | Percentage of total stock outstanding |
|---|---|---|---|
| Reuben B. Hicks | 1,320 | $13,200 | 30.00 |
| Lillian H. Burke | 1,320 | 13,200 | 30.00 |
| J. Dennis Baker | 660 | 6,600 | 15.00 |
| Howard Luck | 440 | 4,400 | 10.00 |
| Earl W. Hurst, Jr. | 330 | 3,300 | 7.50 |
| Franklin A. Holmes | 330 | 3,300 | 7.50 |
| Total | 4,400 | 44,000 | 100.00 |

Subsequently, on October 13, 1966, additional shares of stock were issued to the shareholders for cash, thereby increasing the number of shares outstanding as follows:

| Shareholder | Number of shares | Cost | Percentage of total stock outstanding |
|---|---|---|---|
| Reuben B. Hicks | 1,539 | $15,390 | 30.00 |
| Lillian H. Burke | 1,539 | 15,390 | 30.00 |
| J. Dennis Baker | 770 | 7,700 | 15.00 |
| Howard Luck | 513 | 5,130 | 10.00 |
| Earl W. Hurst, Jr. | 385 | 3,850 | 7.50 |
| Franklin A. Holmes | 385 | 3,850 | 7.50 |
| Total | 5,131 | 51,310 | 100.00 |

The ownership of petitioner's stock remained unchanged from October 13, 1966, until dissolution. Petitioner's shareholders were also its directors. Throughout petitioner's existence, its officers were as follows:

President _____ Reuben B. Hicks
Vice president _____ Howard Luck
Secretary _____ Franklin A. Holmes
Treasurer _____ Earl W. Hurst, Jr.

On or about February 9, 1965, petitioner purchased the Hurst Farm property for $198,951.60. The farm property was the only land ever purchased by petitioner.

The Hurst Farm was purchased initially with the intention of being a long-term investment. Upon recovery of its initial investment and expenses, petitioner intended to hold the remaining property for appreciation in value but, nevertheless, for eventual sale to customers in the ordinary course of business.

Between February 9, 1965, and July 31, 1968, petitioner sold the following parcels:

| Date of sale | Purchaser | Approximate number of acres sold | Sales price |
|---|---|---|---|
| 4/19/65 | W. J. W. L. Properties _____ | 2.000 | $8,000.00 |
| 2/ 2/66 | Keller Industries, Inc._____ | 4.280 | 19,237.50 |
| 4/21/66 | Edward and Grace Gross_____ | 2.000 | 8,000.00 |
| 4/26/66 | John and Madie Shomate _____ | 2.000 | 8,000.00 |
| 2/22/67 | Dexter and Joan Tuthill _____ | 1.000 | 10,000.00 |
| 5/22/67 | Raymond Howell and Erwin Clemen __ | 1.440 | [1]20,000.00 |
| 6/ 8/67 | Paul and June Kline_____ | 1.440 | 13,000.00 |
| 8/ 7/67 | Minnick, Maruco, and Quinn_____ | 3.500 | [1]30,000.00 |
| 8/20/67 | Jack Folker_____ | 5.280 | 20,000.00 |
| 4/17/68 | American Pecco Corp. _____ | 2.000 | 8,000.00 |
| 4/22/68 | Marshall Powell _____ | 14.127 | 42,381.00 |
| 6/ 8/68 | C & R Trucking, Inc. _____ | 5.000 | 18,000.00 |
| 6/22/68 | Reiser and Wagner_____ | 2.000 | 8,000.00 |
| | Total _____ | 46.067 | 212,618.50 |

Of the remaining acreage, 25.6 acres were deeded to Government entities for public use; 90.7567 acres were sold after the adoption of a plan to liquidate on Aug. 16, 1968; and 3.4363 acres were distributed to the shareholders upon liquidation of petitioner.

[1] Included in the May 22, 1967, and Aug. 7, 1967, sales of land were two farm buildings. Of the $20,000 and $30,000 sales prices, $7,000 and $15,000 were attributable to the values of the respective buildings. The adjusted basis of the two buildings was $38,480.

In February of 1965, petitioner began negotiations with the State of Virginia Highway Department for construction of an industrial access road through the middle of the Hurst Farm. In March of 1965, the highway department accepted an offer from petitioner to deed 10 acres and an 80-foot-wide right-of-way in consideration for construction of the road. Thereafter, the highway department constructed the access road.

On January 22, 1968, petitioner entered into a contract to sell a parcel of land to Marshall P. Powell (Powell property). The sale was consummated on April 22, 1968. The contract contained the following provisions:

The purchaser is to hold out $5,000.00 from the purchase price until a road (later referred to) is built to the property.

* * *

The seller is to dedicate to the public an 80 foot right of way for an industrial access road to the property. The right of way will provide access to the approximate center of the land being purchased.

* * *

Within a period of five years after settlement an industrial access road, in accordance with State specifications, is to be built on the aforesaid right of way. This is to be done by either the seller or purchaser as follows:

1. Seller may build and upon completion receive the aforesaid $5,000.00 being held by purchaser until road is completed.

2. Purchaser may elect to build and apply the aforesaid $5,000.00 being held by purchaser toward the cost. Also purchaser may apply any unpaid balance of the said first deed of trust, to the extent necessary, toward the cost of the road.

3. Should purchaser elect to build said road, and the aforesaid $5,000.00 plus the unpaid balance of purchaser's note is not sufficient to cover the road cost, seller is to pay the difference.

4. Should the purchaser elect to build said road, the bills for materials and labor are also to be approved by seller upon ordering the work to be done, but said approval shall not be unreasonably withheld.

The length of the Powell property road was approximately 1,400 feet and was intended as an industrial access road to the Powell property which had no other means of access. In reaching the Powell property, the access road bisects parcels P and Q which had their own means of access by a previously constructed road. The Powell property benefited to a much greater extent from the Powell property access road than did either parcels P or Q.

On its final income tax return for the taxable year ended March 31, 1969, petitioner accrued $35,000 as an increase to the basis of property sold prior to July 31, 1968. The accrual represented petitioner's estimate of the cost to construct an access road to the Powell property. The road was completed in 1972 at a total cost of $48,324.55.

In early March of 1968, Area Investments of Virginia, acting through a real estate broker, offered to purchase substantially all of petitioner's remaining acreage. A Mr. John Basiliko was the president and sole shareholder of Area Investments. Petitioner's board of directors met on March 7, 1968, to consider the offer. It was decided that because soil percolation tests for septic systems and road building were not requirements of the buyer that it was in petitioner's best interest to sell the remaining land to Area Investments. Four contracts were executed with Area Investments as follows:

| Contract number | Date executed | Parcels | Acreage | Selling price | Settlement date | Initial deposit | Additional deposit | Final deposit at settlement |
|---|---|---|---|---|---|---|---|---|
| 1 _-_ | 3/12/68 | H,L,M | 30.3433 | $4,000/acre | 180 days | $2,000 | $3,000 within 45 days | $5,000 |
| 2 _-_ | 3/12/68 | G,I | 33.5112 | 4,000/acre | 210 days | 2,000 | 3,000 within 60 days | 10,000 |
| 3 _-_ | 3/12/68 | N | .9402 | 11,000 | 210 days | 500 | 0 | 700 |
| 4 _-_ | 3/20/68 | P,Q | 25.962 | 4,000/acre | 180 days | 2,000 | 3,000 within 45 days | 11,000 |

On March 12, 1968, Area Investments issued a check in the amount of $6,500 which was intended to cover the initial deposits required under contracts 1 through 4. The $6,500 check was returned by the bank on which it was drawn with the notation "account closed" and it was never paid. On April 26, 1968, John Basiliko, president of Area Investments, executed in his individual capacity a note for $6,500 which was given to the broker. The note, due in 23 days, was intended to cover the initial deposits but it was never paid. The additional deposits set forth above were never made.

On July 24, 1968, petitioner's board of directors met to consider the failure of Area Investments to meet its obligations under contracts 1 through 4. It was resolved that petitioner's attorney notify Area Investments that unless it complied with the contracts within 10 days, they would be terminated. At a meeting on July 26, 1968, petitioner's board of directors authorized its president and secretary to actively seek alternative purchasers for the parcels under contract to Area Investments. On July 31, 1968, petitioner's counsel wrote to Mr. Basiliko and advised him that he had 10 days to provide the $5,000 deposit on contract No. 1 or it would be terminated.

When Mr. Holmes, petitioner's secretary, received a copy of the letter to Mr. Basiliko, he advised petitioner's counsel that it was petitioner's intention to consider all the contracts, not just contract No. 1, terminated within 10 days unless Mr. Basiliko made payment by cash or certified check of $15,500, representing the first two deposits required on contracts 1, 2, and 4 and the first deposit on contract No. 3.

In early August 1968, Mr. Basiliko contacted petitioner's counsel and advised him that Area Investments would assign its interests in the various parcels under the four contracts. Certain assignees were named by Mr. Basiliko and petitioner's counsel prepared the various deeds, deeds of trust, and closing statements. On several occasions, the assignees were changed.

The final assignees under the four contracts were as follows:

| Contract number | Parcel | Assignee |
| --- | --- | --- |
| 1 | H | Schwartz, Hofberg, and Pollock |
| | L, M | Maine Hotel Properties, Inc. |
| 2 | G | Greenstein, Kogod, et al. |
| | I | Maine Hotel Properties, Inc. |
| 3 | N | Maine Hotel Properties, Inc. |
| 4 | P, Q | Greenstein, Kogod, et al. |

Except for the assignments to Maine Hotel Properties, Inc., which was wholly owned by Mr. Basiliko, the assignees were unrelated to Mr. Basiliko and Area Investments and the per-acre sales price for each parcel was $4,500. The sales price of the parcels to Maine Hotel was $4,000 per acre.

Mr. Compton, petitioner's counsel, prepared deeds transferring title to the various parcels from petitioner directly to the assignees and corresponding deeds of trust directly from the assignees to Mr. Compton as trustee for the benefit of petitioner. Simultaneously, separate statements of sale were prepared from petitioner to Area Investments and from Area Investments to the assignees. The statements of sale for the parcels to Maine Hotel were direct from petitioner to Maine Hotel.

On August 9, 1968, Mr. Basiliko delivered an uncertified check in the amount of $26,444 to Mr. Compton which represented the cash due from the Greenstein group for the purchase of parcels P and Q. The check was immediately deposited into Mr. Compton's law firm trust account. Thereafter, sometime between August 9 and August 21, 1968, an uncertified check in the amount of $14,058.61, representing the cash due from the Hofberg group for the purchase of parcel H, was delivered to Mr. Compton. Mr. Basiliko instructed Mr. Compton to apply the $500-per-acre gain due Area Investments on the assignments to the cash deposit due from Maine Hotel and to pay any excess gain to Maine Hotel. On August 21, 1968, Mr. Basiliko delivered to Mr. Compton an uncertified check in the amount of $24,340.44, representing the cash due from the Greenstein group for the purchase of parcel G. Since the $24,340.44 check was the final one due from the assignees, Mr. Compton directed the bank to use a special collection procedure whereby he would be immediately notified whether sufficient funds existed for the check to be collected. The bank notified Mr. Compton on August 22, 1968, that the final check had cleared. He thereupon delivered the deeds and took the necessary steps to consummate the sales. The sales under contracts 1 through 4 were consummated on August 22, 1968.

Real estate broker's commissions were paid by petitioner for the sale contracts 1 through 4 based upon the sales price agreed upon between it and Area Investments.

On August 16, 1968, "a plan of complete liquidation," as described in section 337(a)(1) of the Code, was adopted by

petitioner. Messrs. Holmes, Hicks, and Hurst previously discussed the possibility of a bulk sale and dissolution of petitioner in March of 1968.

Petitioner reported the following income and expense items on its corporate Federal income tax returns for its taxable years ending March 31, 1966 through 1969:

| Income: | 3/31/66 | 3/31/67 | 3/31/68 | 3/31/69 |
|---|---|---|---|---|
| Gains from sales of property | $20,092.07 | $14,863.01 | $13,792.00 | $8,347.07 |
| Installment sales prior years | - - - | - - - | - - - | 14,223.98 |
| Sod sales | 934.98 | 600.00 | 2,320.32 | - - - |
| Gross rental | 1,767.50 | 2,762.25 | 370.00 | - - - |
| Interest | 158.77 | 755.31 | 1,579.65 | 13,050.97 |
| Total income | 22,953.32 | 18,980.57 | 18,061.97 | 35,622.02 |
| Expenses: | | | | |
| Interest | 6,402.39 | 7,109.05 | 4,759.27 | 1,206.70 |
| Depreciation | 9,536.00 | 8,579.50 | - - - | - - - |
| Directors' fees | 3,600.00 | - - - | - - - | 3,600.00 |
| Compensation of officers | 820.00 | - - - | - - - | - - - |
| Taxes: | | | | |
|    Real estate | 1,692.47 | 1,765.08 | 1,214.50 | 1,216.90 |
|    Franchise | 160.00 | 80.00 | 80.00 | 84.00 |
|    State income | 1.16 | - - - | 553.43 | 1,344.27 |
|    Personal property | - - - | 2.26 | - - - | - - - |
| Commissions | 122.50 | - - - | - - - | - - - |
| Repairs | - - - | 1,927.55 | 272.00 | - - - |
| Insurance | 366.36 | 50.55 | 82.90 | - - - |
| Office supplies | 43.17 | - - - | 47.50 | 16.73 |
| Revenue stamps on stock | 50.05 | 8.05 | - - - | - - - |
| Utilities | 137.10 | 69.07 | 2.20 | 7.29 |
| Survey | - - - | - - - | 240.00 | - - - |
| Legal and audit | - - - | 325.00 | 295.00 | 2,605.00 |
| Total expenses | 22,931.20 | 19,916.11 | 7,546.80 | 10,080.89 |
| Net operating loss (carryover) | | 935.54 | 918.29 | |
| Taxable income reported | 22.12 | | 9,596.88 | 25,541.13 |

The Commissioner, in his statutory notice of deficiency, determined that—

the estimated cost of building a road in the amount of $35,000.00 deducted on the tax return as cost of goods sold is not a proper accrual under the accrual method of accounting adopted by the corporation. Construction of the road had not begun at the end of the taxable year and the cost could not be determined. Taxable income is, therefore, increased in the amount of $35,000.00 for the taxable year ended March 31, 1969.

As an alternative to the above position the cost of road construction would not be allowable as a current deduction but would be a capital expenditure under section 263 of the Internal Revenue Code.

The Commissioner also determined that gains in the total amount of $235,954.95 derived from real estate sales in August 1968 were includable in petitioner's gross income for the taxable year ended March 31, 1969, because petitioner was a collapsible corporation and, therefore, the gain did not qualify for nonrecognition as provided in section 337. It was further determined, in the alternative, that gains from the sales did not

qualify under section 337(a) because the parcels of land sold were the stock in trade or inventory of petitioner and such parcels were not sold in a bulk sale. In addition, it was determined that said sales occurred prior to the date of the adoption of the plan of complete liquidation and the transactions were, therefore, not within the scope of the nonrecognition provisions of section 337.

## OPINION

Respondent contends that petitioner is not entitled to the nonrecognition benefits of section 337(a) because petitioner was a collapsible corporation under section 341(b)[2] when its plan of liquidation was adopted and, therefore, section 337(c)(1)(A) precludes nonrecognition. Petitioner argues that it was not a collapsible corporation for the following five reasons:

(1) Petitioner was not availed of principally for the manufacture, construction, or production of property with a simultaneous view towards liquidation, as provided in section 341(b)(1)(A), because the view toward liquidation occurred after manufacture, construction, or production was completed. *Computer Sciences Corp.*, 63 T.C. 327 (1974). Sec. 1.341-2(a)(3), Income Tax Regs.;

(2) All manufacturing, construction, and production of the real property was completed by petitioner more than 3 years prior to

[2] SEC. 341. COLLAPSIBLE CORPORATIONS.
(b) DEFINITIONS.—
(1) COLLAPSIBLE CORPORATION.—For purposes of this section, the term "collapsible corporation" means a corporation formed or availed of principally for the manufacture, construction, or production of property, for the purchase of property which (in the hands of the corporation) is property described in paragraph (3), or for the holding of stock in a corporation so formed or availed of, with a view to—
(A) the sale or exchange of stock by its shareholders (whether in liquidation or otherwise), or a distribution to its shareholders, before the realization by the corporation manufacturing, constructing, producing, or purchasing the property of a substantial part of the taxable income to be derived from such property, and
(B) the realization by such shareholders of gain attributable to such property.
(2) PRODUCTION OR PURCHASE OF PROPERTY.—For purposes of paragraph (1), a corporation shall be deemed to have manufactured, constructed, produced, or purchased property, if—
(A) it engaged in the manufacture, construction, or production of such property to any extent,
* * *
(3) SECTION 341 ASSETS.—For purposes of this section, the term "section 341 assets" means property held for a period of less than 3 years which is—
(A) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year;
(B) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business;

the realization of gain by its shareholders and such property was, therefore, not a section 341 asset within the meaning of section 341(b)(3). Sec. 1.341-4(d), Income Tax Regs.;

(3) In any event, section 341(b) was not intended to include nondepreciable real property. *Computer Sciences Corp., supra;*

(4) Assuming that the term "realization," used in section 341(b)(1)(A) means "recognition," petitioner recognized 39 percent, a substantial part of its taxable income, from the section 341 property, prior to the adoption of its plan of liquidation; and

(5) Pursuant to section 341(b)(1), petitioner realized 93 percent, a substantial part of its taxable income, from the section 341 property prior to the distribution of property to its shareholders.

Assuming petitioner is not a collapsible corporation and can avail itself of the nonrecognition benefits of a section 337(a) liquidation, respondent contends that the real property in question was not sold in a bulk sale to "one person in one transaction." Sec. 337(b)(1) and (2). Respondent has conceded that the sales in question occurred after the adoption of the plan of liquidation.

We must also decide the proper allocation of $48,824.55 accrual of construction costs of the Powell road between the Powell property, sold by petitioner prior to the adoption of the plan of liquidation, and parcels P and Q, sold after adoption of the plan.

The question of allocation of the cost of the road will be moot if respondent prevails either on the collapsible corporation issue or the bulk sale issue because the gain from all the properties involved will be recognized and the cost of the road will, accordingly, reduce the gain. However, because the allocation of the costs of the Powell road will affect the "realized taxable income" before and after adoption of the plan of liquidation, and consequently the question of substantiality of income under section 341(b)(1)(A), it will be considered first.

Pursuant to the sales contract accompanying petitioner's sale of the Powell property to Marshall P. Powell, petitioner was obligated to absorb the cost of constructing an access road to that property either directly, if petitioner constructed the road, or indirectly, if the purchaser constructed the road. The Commissioner determined that the estimated cost of building a road in the amount of $35,000 was not a proper accrual because the cost

could not be determined. As an alternative position, the Commissioner determined that the accrual was not allowable as a current deduction but should, instead, be capitalized. The parties now agree that the proper amount of the accrual should have been $48,324.55. They also agree that the construction cost should be capitalized rather than expensed. The disagreement focuses on what portion of the $48,324.55 is allocable to the cost of the Powell property, sold by petitioner prior to the adoption of the plan of liquidation, and what portion is allocable to petitioner's cost basis in parcels P and Q, sold after adoption of the plan of liquidation.

Respondent contends that one-third or $16,108.19 of the $48,324.55 should be allocated to the Powell property. Petitioner submits that the $35,000 allocated to the Powell property on its final return was proper and that the difference between the stipulated accrual of $48,324.55 and $35,000, or $13,324.55, should be allocated to parcels P and Q.

We agree with petitioner. The Powell property had no access other than the road. Parcels P and Q were not landlocked because they had frontage on a different access road. It is not clear from the record whether the Powell property road was a benefit to parcels P and Q, but it is clear that petitioner's allocation of $35,000 to the Powell property agreed upon $48,324.55 total is reasonable and supported by the record.

Petitioner contends that any manufacturing, construction, or production of its real property occurred prior to the time when it first had a view toward liquidation of its assets to its shareholders. E.g., *F.T.S. Associates,* 58 T.C. 207 (1972). Respondent takes the position that petitioner's activities of subdividing and surveying the parcels sold, dedicating rights-of-way for access roads, and the construction of the Powell road constituted construction and such construction was continuous up to, including, and after the existence of the view toward distribution. We must, therefore, decide: (1) When did petitioner first entertain the proscribed view toward distribution under section 341(b)(1); (2) did the activities engaged in constitute "construction"; and (3) what was the length of the period of construction.

Section 1.341-2(a)(2) of the Income Tax Regulations sets forth the test applied to determine when the view toward distribution occurred.

This requirement is satisfied in any case in which such action was contemplated by those persons in a position to determine the policies of the corporation, whether by reason of their owning a majority of the voting stock of the corporation or otherwise. The requirement is satisfied whether such action was contemplated, unconditionally, conditionally, or as a recognized possibility. * * *

When the contracts with Area Investments were executed in early March of 1968, Messrs. Hicks, Holmes, and Hurst discussed the possibility that if the sale were consummated it would be a bulk sale and that dissolution would be in order. The three parties represented 45 percent of the outstanding stock and were petitioner's president, secretary, and treasurer. Although, as petitioner points out, the discussions were not serious, it cannot be denied that petitioner's policymakers considered dissolution as a recognized possibility in early March of 1968. Therefore, petitioner first entertained the possibility of liquidation in the early part of March 1968.

Petitioner maintains that the only activity it engaged in which can be characterized as construction is when the 10-acre parcel was deeded to the highway department in March of 1965 in return for a pledge by the State of Virginia to construct an access road. In view of our prior decisions which were concerned with construction as it relates to real estate projects, we believe petitioner has applied an overly narrow interpretation to the term "construction."

In *Sproul Realty Co.,* 38 T.C. 844 (1962), the taxpayer purchased real property and intended to construct a shopping center. However, prior to physical construction of the shopping center, the taxpayer agreed to sell the property and be responsible for the construction of the shopping center. The center was completed after the adoption of the plan of liquidation and we held that the requisite view occurred before completion of the construction. In effect, actual physical construction at the time when the view exists is not necessary when the corporation has obligated itself to accomplish the construction at some future date—construction exists throughout the period from the time when the obligation to construct was incurred until its completion.

The result here should not be otherwise merely because the construction was completed after dissolution. Likewise, the fact that either petitioner or the purchaser of the Powell property was

obligated to secure the actual physical construction is immaterial because petitioner, or its successors in dissolution, were obligated to absorb the cost of the construction. Any doubt concerning the effect of such an arrangement is resolved by the committee reports.

Subparagraph (B) of paragraph (2) of the subsection states that a corporation shall be deemed to have manufactured, constructed or produced property if it engaged in the manufacture, construction or production of such property to any extent or if it holds property having a substituted basis under section 113 of the Code determined by reference to the cost of property manufactured, constructed, or produced by the corporation or by another. Under this statement the corporation need not have originated the manufacture, construction or production; *neither need* the manufacture, *construction* or production *be completed by it.* It will nonetheless be deemed to have manufactured, constructed or produced property in that its shareholders may realize gain with respect to the additional value added to the property by the manufacture, construction or production to the extent that it was carried out. * * * [Emphasis added. H. Rept. No. 2319, 81st Cong., 2d Sess. 98, 1950-2 C.B. 450. See also S. Rept. No. 2375, 81st Cong., 2d Sess. 89, 1950-2 C.B. 547; *J. D. Abbott,* 28 T.C. 795, 805 (1957).]

Petitioner's reliance on *Computer Sciences Corp.,* 63 T.C. 327 (1974), is misplaced. In *Computer Sciences Corp.,* at page 351, we emphasized that the production of a process which will go through continuing change and development is "so factually different" from cases involving construction of real estate as to render the real estate cases of very little help in deciding when construction of a process is completed. Petitioner commenced construction on the Powell property in April of 1968 shortly after it considered liquidation as a recognized possibility.

Because we have concluded that petitioner commenced construction of the Powell property road when it became obligated to absorb its cost under the contract of sale in April of 1968 and because such construction was continuous throughout its existence, petitioner's contention that all construction had been completed more than 3 years prior to the realization of gain by the shareholders on liquidation must also fail.

Petitioner contends that the collapsible corporation provisions do not apply to nondepreciable property because the abuses against which section 341 was directed involved the depreciation deduction. Respondent counters with *Computer Sciences Corp., supra,* wherein we held that intangible property came within the collapsible corporation provisions.

There is no language in section 341 limiting its applicability to depreciable property. Obviously, that cannot be the meaning of the statute because property held for sale to customers is not subject to the allowance for depreciation (*William I. Nash,* 60 T.C. 503, 519 (1973)), and one of the principal loopholes against which the statute was directed was the use of a corporation to construct such property with a view to collapse of the corporation. See *Braunstein v. Commissioner,* 374 U.S. 65 (1963); S. Rept. No. 2375, 81st Cong., 2d Sess. 88, 91 (1950), 1950-2 C.B. 546, 547.

However, we perceive that petitioner is attempting to raise a broader argument. This is that, where real estate is involved, the constructed property contemplated by the statute must include a structure of some kind, such as an apartment building, a shopping center, or a home. This argument would assert that when the property in question is vacant real estate, such property is not susceptible of construction and is thus not encompassed by the construction provision.

This argument has an initial attractiveness because it seems compatible with the provision of the statute relating to purchased property. Under that provision, a corporation holding vacant realty for sale to customers may be collapsible without having engaged in construction to any extent. See, e.g., *Guy A. Van Heusden,* 44 T.C. 491 (1965), affd. 369 F.2d 119 (5th Cir. 1966). However, in that instance, it will be held collapsible only if the prohibited view existed at the time of purchase. *Southwest Properties, Inc.,* 38 T.C. 97 (1962); sec. 1.341-2(a)(3), Income Tax Regs.

Whatever the validity of such an argument in another case, it has no application to the facts of this case. The asset involved in this case was not simply vacant land. It was an industrial subdivision. The original parcel was rezoned and carved up into smaller parcels for resale to industrial customers. And the resale of these smaller parcels necessitated construction of access roads which petitioner stood ready to procure from the State by dedication of rights-of-way or to undertake construction of itself. In other words, petitioner was embarked on a project of development of the land for sale to industrial users, and this project involved construction. In our view, the particular facts of this case are sufficient to meet the terms of the statute. *Jack Farber,* 36 T.C. 1142 (1961), affd. 312 F.2d 729 (2d Cir. 1963); *J. D. Abbott,* 28

T.C. 795 (1957), affd. 258 F.2d 537 (3d Cir. 1958); accord *Joseph M. Crowe,* 62 T.C. 121, 127 (1974). Cf. *Morris Cohen,* 39 T.C. 886 (1963), where the land was held as an investment and no specific project thereon had been undertaken.

Section 341(b) defines a "collapsible corporation" to include a corporation availed of principally for the purchase or construction of property held primarily for sale to customers in the ordinary course of its trade or business with a view to liquidating the corporation before the realization by the corporation of a substantial part of the taxable income to be derived from such property. The parties disagree on the intended meaning and the factors used to ascertain whether there has been a realization of a substantial part of the taxable income derived from the property. As set forth in the computations below, petitioner contends not only that it realized 93.3 percent of the taxable income but that it both realized and recognized 39 percent of the taxable income. On the other hand, respondent contends that only 19.1 percent of the taxable income was realized. The parties' computations are as follows:

| | Petitioner | | Respondent |
| | Gross profit from land | Realized profit | Taxable income per return |
|---|---|---|---|
| Year ended: | | | |
| 3/31/66 | $21,000 | $21,000 | $22.12 |
| 3/31/67 | 15,500 | 15,500 | (935.54) |
| 3/31/68 | 16,100 | 16,100 | 9,596.88 |
| Building loss adjustment | 16,500 | 16,500 | - - - |
| 1969—prior to 8/68 | 22,600 | 22,600 | 25,541.13 |
| Road accrual adjustment | 35,000 | (13,300) | 18,891.82 |
| Income realized but not recognized | - - - | 236,000 | - - - |
| Pre 8/68—property expense allocation | (20,200) | (59,900) | - - - |
| Total—(A) | 106,500 | 254,500 | 53,116.40 |
| | | | |
| After 8/68 property expense allocation | (41,100) | (1,400) | - - - |
| Road accrual adjustment | (48,300) | - - - | (32,216.36) |
| Gross profit after 8/68 | 255,800 | 19,800 | 255,755.04 |
| Total—(B) | 272,900 | 272,900 | 276,655.08 |
| (A) as percent of (B) | 39% | 93.3% | 19.1% |

Petitioner's computation of 93.3 percent "realized profit" is inaccurate because it is based on an erroneous assumption. By including $236,000 "Income realized but not recognized" in its computation of the amount of taxable income realized *before* the liquidation, petitioner included gains realized *after* the adoption of the plan of liquidation, and petitioner urges us to find that the date of distribution of the assets in liquidation is the relevant cutoff point for deciding the amounts of taxable income realized before and after the liquidation.

In *Sproul Realty Co.,* 38 T.C. 844, 857 n. 5 (1962), we held that if income realized during the 12-month liquidation period were included in deciding whether the corporation had realized a substantial part of its taxable income before the distribution to its shareholders then such an interpretation would render section 337(c) meaningless.

> Without the approach taken by the regulations or one comparable thereto, the exception for collapsible corporations in section 337(c) would have little or no meaning. Since any sale or exchange made pursuant to section 337 results in the corporation realizing (but not recognizing) income on its property prior to a distribution to its shareholders, no corporation liquidating under section 337 could ever come within that portion of the collapsible corporation definition requiring a sale or exchange of stock or a distribution to shareholders *before* the realization by the corporation of a substantial part of the taxable income to be derived from the property. Cf. DeWind & Anthoine, "Collapsible Corporations," 56 Col. L. Rev. 475, 523-526 (1956); MacLean, "Taxation of Sales of Corporate Assets in the Course of Liquidation," 56 Col. L. Rev. 641, 666-668 (1956). [*Sproul Realty Co.,* 38 T.C. 844, 857 n. 5 (1962).]

We, therefore, reject petitioner's interpretation as contrary to the expressed intent of the statute. *Guy A. Van Heusden,* 44 T.C. 491, 499 (1965), affd. 369 F.2d 119 (5th Cir. 1966).

On the other hand, respondent, in his computation of income realized after the adoption of the plan of liquidation, has failed to allow expenses incurred during that period in determining total income to be derived from the property. Respondent argues that "collapsibility must be decided on the basis of what would happen if the corporation were to liquidate by distributing the assets to the shareholders, rather than selling the assets and distributing the cash." He directs our attention again to *Sproul Realty Co.,* 38 T.C. at 856-857, wherein we stated:

> Does petitioner in these circumstances come within the statutory definition of a collapsible corporation? In accordance with the regulations[4] issued under section 337 of the 1954 Code, this question must be decided on the basis of

what would have happened if petitioner had liquidated the corporation by distributing its interest in the shopping center directly to its shareholders instead of selling that interest to the Knights of Columbus and distributing the resulting cash to its shareholders thereafter. The regulations provide that if petitioner would have been collapsible had it distributed its property in kind to its shareholders, then it remains collapsible for purposes of applying the provisions of section 337 when it sells or exchanges its property pursuant to a plan of liquidation. We think that insofar as they are pertinent herein, the regulations represent a reasonable and proper interpretation of what Congress intended when it excepted collapsible corporations from the operation of the non-recognition provisions of section 337.[5] [Fns. omitted.]

In *Sproul* we were not concerned with the question of whether expenses should be estimated and deducted in computing the amount of the total taxable income to be derived from the property in deciding the substantiality question. We, therefore, do not consider the language in *Sproul* to be controlling in resolving the issue before us now.

We hold that the computation of total taxable income requires allowance for estimated expenses which would have been incurred had the property been held by the corporation for disposition in the ordinary course of its trade or business. In *James B. Kelley,* 32 T.C. 135, 151 (1959), affd. 293 F.2d 904 (5th Cir. 1961), we explained that our concern is not with gross profits but with net profits which must be reasonably approximated.

As we said in *Rose Sidney, supra* at 1163, "In determining what is 'a substantial part of the net income to be derived from such property' we must consider the relationship between the net income realized by the corporation prior to the distributions and the whole of the net income which may be reasonably anticipated to be derived from such property." It is obvious that in many cases (as in the cited case) the amount of "the whole of the net income which may be reasonably anticipated to be derived from such property" must be an approximation. In the instant cases the approximation can be close to the absolute amount since the property was liquidated within 3 years subsequent to the sale of the stock. However, there must still be some approximation since we are concerned not with gross receipts but with net profits. It would not, in our opinion, be within the legislative intent of the statute for "the whole of the net income which may be reasonably anticipated to be derived from such property" to be measured by two different bases or two different accounting systems. Stated another way, it is our opinion that "the whole of the net income which may be reasonably anticipated" must be approximated as of the date of the sale or exchange of the corporation's stock on the assumption that the cost basis and accounting method used by the corporation in measuring its net income from the property at that time will remain static.

See also *Arthur Pomponio,* 33 T.C. 1072, 1080 (1960), affd. 288 F.2d 827 (4th Cir. 1961); *George W. Day,* 55 T.C. 257, 258 (1970); *E. J. Zongker,* 39 T.C. 1046, 1052 (1963), affd. 334 F.2d 44 (10th Cir. 1964).

An additional point of disagreement between the parties stems from petitioner's use of gross profits from the land which it then adjusted by an allocation of the total expenses incurred from April 1, 1965, through March 31, 1969. Petitioner used an expense deduction of $20,200 for the period before liquidation and $41,100 for the period after liquidation. Petitioner details its expenses from April 1, 1965, through March 31, 1969, as follows:

*Detail of expenses—4/1/65-3/31/69*

Allocable property expenses:

| | |
|---|---|
| Real estate taxes | $5,887 |
| Survey | 240 |
| Total | 6,127 |

Rental expenses—buildings:

| | |
|---|---|
| Depreciation | 18,116 |
| Commissions | 123 |
| Insurance | 500 |
| Utilities | 208 |
| Repairs | 2,200 |
| Personal property taxes | 2 |
| Total | 21,149 |

Administrative expenses not connected with land:

| | |
|---|---|
| Officers and directors fees | 8,025 |
| Professional fees | 3,220 |
| Franchise taxes | 404 |
| State income tax | 1,898 |
| Office supplies | 115 |
| Revenue stamps (stock certificates) | 58 |
| Total | 13,720 |

| | |
|---|---|
| Total expenses | 40,996 |

Petitioner's accountant prepared the computations and testified that only direct expenses having to do with the property, i.e., the real estate taxes and survey fees, were deducted in arriving at the 39-percent ratio. He further testified that no adjustment was made for rental expenses or administrative expenses. Rental and interest income were not considered nor was any adjustment

made for interest expense. Based on the above information and a close scrutiny of the testimony of petitioner's accountant and his method of allocating the expenses, we have been unable to determine how he derived the $20,200 "Pre 8/68 property expense allocation" and we, therefore, reject such computation.

Respondent's computation is based on taxable income as reported on petitioner's corporate Federal income tax returns. As we stated in *James B. Kelley, supra,* our concern is with the whole of the taxable income which may be reasonably anticipated to be derived from such property. The statute refers specifically to "a substantial part of the taxable income to be derived from such property." "Such property" clearly refers to the real property constructed by petitioner. We are, therefore, not concerned with all taxable income generated by petitioner but only that portion related to the real property.

Petitioner was availed of principally for the purchase, construction, and resale of the real property. The income and expenses which bear on the question of the total taxable income to be derived from such property should be limited to those directly and integrally related to such property. Petitioner was correct in not including interest income in its computation of the taxable income to be derived from the real property. In *James B. Kelley, supra* at 152, we recognized that approximating the taxable income to be derived from the property involved an approximation "using the basis and accounting methods actually used." Under those circumstances, it was necessary to decrease the taxable income to be derived from the property after the sale of the stock because the purchasers of the stock, whose taxable income figures were used for the after-the-sale taxable income, did not take deductions for compensation of officers or salaries and wages as was done by the alleged collapsible corporation. Similarly, in *Rose Sidney,* 30 T.C. 1155, 1163 (1958), affd. 273 F.2d 928, 930 (2d Cir. 1960), we excluded mortgage premium income from taxable income before the realization which, although taxable income of the corporation, was not taxable income to be derived from such property when the property involved consisted of apartment buildings. In this instance, petitioner reported the following amounts of interest income:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1966 | $158.77 | 1968 | $1,579.65 |
| 1967 | 755.31 | 1969 | 13,050.97 |

The interest was earned as a consequence of the method of financing the real property sales; such interest has no bearing on whether petitioner realized a substantial part of the taxable income to be derived from sale of the real property.

With regard to the interest expense which resulted as a consequence of financing the initial purchase of the real property, we held in *Arthur Pomponio,* 33 T.C. 1072, 1080 (1960), affd. 288 F.2d 827 (4th Cir. 1961), that interest expenses incident to the financing of rental property were properly deductible in computing the relevant taxable income.

In its computations, petitioner also excluded rental income and rental expense items and general administrative costs. We have held that general administrative expenses should be included in computing the taxable income to be derived from such property as integrated support items to the operation of the corporation. *James B. Kelley, supra; Arthur Pomponio, supra.* Although petitioner intended from the outset to hold the real property principally for resale, there were farm buildings on the land which petitioner chose to rent and depreciate. Although the statute limits the relevant corporate taxable income to that to be derived from such property, there is no restriction that such taxable income is limited to the principal method of disposition intended by the corporation for realization of gain from the property. See *G. A. Heft,* 34 T.C. 86, 88 (1960), affd. 294 F.2d 795 (5th Cir. 1961). The fact that petitioner sold the parcels which contained the farm rental property before adoption of the plan of liquidation and that there will consequently be no anticipated rental income for the period after adoption of the plan does not distort the computation.

Petitioner also seeks to adjust the taxable income before adoption of the plan of liquidation for a $16,480 loss on two farm buildings which were sold with the May 22, 1967, and August 7, 1967, parcels. Of the amounts realized on the sales, $22,000 was attributable to the value of the buildings which, with an aggregate basis of $38,480, yields a loss on the sale of the buildings of $16,480. Petitioner claims that the building losses obscure the true taxable income attributable to the real property. Respondent maintains that the land and building constitute a single property unit for collapsible property purposes, relying on Rev. Rul. 68-476, 1968-2 C.B. 139.

We have previously held that the rental income and expenses which petitioner derived from the farm buildings were properly includable as income to be derived from the real property. To increase petitioner's taxable income for the losses incurred on the buildings would effectively ignore the value of the buildings as part of the value inherent in the real property. The farm buildings were not sold as assets separate and distinct from the real property; the buildings were sold as a part of the underlying real property which was held primarily for sale to customers in the ordinary course of its business.

Taxable income reported on the corporate Federal income tax returns is the best starting point for the necessary computation from which interest income, unrelated to the real property, is deducted.

We have also approximated the expenses to be incurred in the future based upon the assumption that 71.607 acres of the total 165.8 acres were either sold or dedicated to public use prior to the adoption of the plan. Consequently, the $6,127 · direct expenses and the $13,720 general expenses incurred prior to the adoption of the plan represent 71.607/165.8 of $14,186.81 and $31,768.08, respectively, the total anticipated and approximated direct and general expenses. Therefore, our deductions for expenses incurred after adoption of the plan are $8,059.81 for direct expenses and $17,581.27 for general administrative expenses. The interest expense incurred prior to the adoption of the plan of liquidation amounted to $19,477.41. Consequently, the anticipated interest expense is $25,745.17.

| Year ended: | |
|---|---|
| 3/31/66 _____ | $22.12 |
| Less interest income _____ | (158.77) |
| 3/31/67 _____ | [1](22.12) |
| Less interest income _____ | (755.31) |
| 3/31/68 _____ | 9,596.88 |
| Less interest income _____ | (1,579.65) |
| 1969—prior to 8/68 _____ | 25,541.13 |
| Less interest income _____ | (13,050.97) |
| Road accrual adjustment _____ | [2]0 |
| Total—(A)_____ | 19,593.31 |
| Gross profits on contracts 1—4 _____ | [3] 255,755.04 |
| Road accrual adjustment _____ | (13,324.55) |
| Direct real property expenses _____ | (8,059.81) |
| General administrative expenses _____ | (17,581.27) |

Interest expense _____ (25,745.17)

Total taxable income—(B) _____ 210,637.55
(A) as a percent of (B) _____ 9.3%

[1] The net loss of $935.54 for 1967 was absorbed as a net operating loss first against 3/31/66 taxable income of $22.12 with the remainder reflected in the $9,596.88 taxable income for 3/31/68.

[2] The allocation of $35,000 for the Powell property road accrual was deducted as a cost of goods sold on the final return.

[3] Respondent and petitioner agree that $255,755.04 represents the gross profit to be derived from the real property sales. Accordingly, we assume that this figure incorporates the gain inherent in the 3.4363 acres distributed in liquidation.

We conclude that petitioner realized 9.3 percent of its total taxable income from the property prior to forming the intent to liquidate. In other cases, we have found 17 percent was not substantial, *G. A. Heft,* 34 T.C. 86 (1960), affd. 294 F.2d 795 (5th Cir. 1961); 10 percent was not substantial, *J. D. Abbott,* 28 T.C. 795 (1957), affd. 258 F.2d 537 (3d Cir. 1958); 9.5 percent was not substantial, *Max N. Tobias,* 40 T.C. 84 (1963). Accordingly, we hold here that 9.3 percent is not substantial.

Upon a considered review of petitioner's contentions against respondent's characterization of it as a collapsible corporation, we conclude that petitioner was indeed a collapsible corporation when it adopted a plan of complete liquidation and it is, therefore, not entitled to the nonrecognition benefits of section 337(a) because of the application of section 337(c)(1)(A). We, therefore, need not consider respondent's alternative position that the real property in question was not sold in a bulk sale to "one person in one transaction."

*Decision will be entered for the respondent.*